[No. C065463. Third Dist. Mar. 28, 2012.]

CITIZENS FOR OPEN GOVERNMENT, Plaintiff and Appellant, v.
CITY OF LODI et al., Defendants and Respondents;
BROWMAN DEVELOPMENT COMPANY, INC., et al., Real Parties in
Interest and Respondents.

[No. C065719. Third Dist. Mar. 28, 2012.]

LODI FIRST, Plaintiff and Appellant, v.
CITY OF LODI, Defendant and Respondent;
BROWMAN DEVELOPMENT COMPANY, INC., et al., Real Parties in
Interest and Respondents.

[CERTIFIED FOR PARTIAL PUBLICATION*]

*Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts IB, IC, the last paragraph of the introduction to III, IIIB, IIID, V, VI, and VII of the Discussion.

COUNSEL

Law Offices of Donald B. Mooney, Donald B. Mooney and John L. Marshall for Plaintiff and Appellant Citizens for Open Government.

Herum Crabtree, Brett S. Jolley and Natalie M. Weber for Plaintiff and Appellant Lodi First.

Kronick, Moskovitz, Tiedemann & Girard, Jonathan P. Hobbs, Mona G. Ebrahimi, Christopher Onstott; D. Stephen Schwabauer, City Attorney, and Janice D. Magdich, Deputy City Attorney, for Defendant and Respondent City of Lodi.

Remy, Thomas, Moose and Manley, Andrea K. Leisy, Howard F. Wilkins III and Laura M. Harris for Real Party in Interest and Respondent Browman Development Company, Inc.

Sheppard, Mullin, Richter & Hampton and Arthur J. Friedman for Real Party in Interest and Respondent Wal-Mart Stores, Inc.

OPINION

**ROBIE, J.**—This opinion addresses three actions consolidated in the trial court under the California Environmental Quality Act. (CEQA; Pub. Resources Code, § 21000 et seq.) The plaintiffs/petitioners are two citizens groups—Citizens for Open Government (Citizens) and Lodi First—that are challenging reapproval by defendant the City of Lodi (the city) of a conditional use permit for a proposed shopping center project (the project) to be developed by Browman Development Company, Inc. (Browman Company), after the original environmental impact report (EIR) for the project was revised and recertified. The project is anchored by a Wal-Mart Supercenter, slated to take the place of a smaller Wal-Mart across the street from the project.

The first action was the city's application for discharge of the trial court's December 2005 writ of mandate. The December 2005 writ issued because the original EIR was inadequate in its analysis of energy impacts and cumulative urban decay impacts. The revised EIR addressed those two areas and three others: the discussion of agricultural resources, the statement of project objectives, and the discussion of project alternatives. The city's application for discharge of the 2005 writ followed the city council's action certifying the revised EIR and approving the project. In that revised EIR, the city concluded

some comments it had received on the draft revised EIR were beyond the scope of the revisions and barred by res judicata. Therefore, no substantive response was provided.

The second and third actions were Citizens's and Lodi First's petitions for writ of mandate contending the city violated CEQA by certifying the revised EIR. Among the issues they raised were whether res judicata applied, whether a stipulation entered into by Citizens with the city and Browman Company waived the defense of res judicata, and whether the substantive analyses of certain sections of the revised EIR were adequate.

The trial court consolidated these actions and issued one ruling. In that ruling, the court granted the city's request to discharge the December 2005 writ and denied Citizens's and Lodi First's petitions for writ of mandate.

Citizens and Lodi First both appeal from the resulting judgments. Lodi First also appeals from the order discharging the writ. In these appeals, they allege deficiencies in the administrative record and the revised EIR and error in the trial court's ruling precluding them from challenging certain issues based on res judicata. We find no prejudicial error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A

*The Project*

In June 2002, Browman Company applied to the city for a use permit to develop a 35-acre shopping center project in west Lodi on farmland previously used for row crops. The project was 339,966 square feet of commercial retail space with the anchor tenant a 226,868-square-foot Wal-Mart Supercenter, which would take the place of an existing 119,684-square-foot Wal-Mart that lacked a grocery department and was located across the street from the project.

### B

*The 2004 EIR and the City's Initial Approval of the Project*

In April 2003, the city issued a notice of preparation of a draft EIR. In August 2004, the city published its draft EIR. In December 2004, the city's planning commission certified the final EIR and approved the project. Lodi

First appealed the certification and approval, claiming the project conflicted with the city's zoning code, was inconsistent with the city's general plan, and did not satisfy CEQA.

In February 2005, the city council denied Lodi First's appeal and affirmed the planning commission's certification of the final EIR. The city filed a notice of determination of its approval of the project later that month.

C

*Proceedings in the Trial Court and the Appellate Court on the 2004 EIR*

In the trial court, Lodi First and Citizens filed separate lawsuits (*Lodi First I* and *Citizens I*) challenging the city's approval of the project. In October 2005, the trial court dismissed *Citizens I* because Citizens had not filed an administrative appeal. In December 2005, the trial court granted the petition for writ of mandate in *Lodi First I*, holding that the 2004 EIR was inadequate under CEQA in its analysis of the project's energy impacts and cumulative urban decay impacts. Rather than appeal the trial court's ruling in *Lodi First I*, in May 2006 the city council rescinded approval of the project and decertified the 2004 EIR.

In October 2006, this court reversed the trial court's dismissal of *Citizens I*, holding that Citizens had exhausted administrative remedies by appearing before the city and objecting to the project and the 2004 EIR and that the appeal was not moot. This court remanded the matter to the trial court. (*Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 869, 872, 875–876, 879 [50 Cal.Rptr.3d 636].)

D

*The Stipulation and 2007 Revised EIR*

In November 2006, the city issued a notice of preparation for the revised EIR.

In July 2007, Citizens stipulated with the city and Browman Company to dismiss Citizens's action filed in *Citizens I*. Among other things, the stipulation stated: "Subject to applicable exhaustion of administrative remedies requirements, Citizens shall have the right to assert any claim, including any claim asserted in this action, in any subsequent litigation over Lodi's reconsideration of the Project and the adequacy of the revised EIR."

In October 2007, Pacific Municipal Consultants prepared draft revisions to the 2004 EIR. The revisions included "a revised discussion of urban decay impacts as well as a full section on energy." In addition, the city "decided to make revisions to three additional areas of the EIR, namely[,] the statement of project objectives, the discussion of agricultural resources, and the discussion of project alternatives."

In October 2007, the city circulated the revisions for public review and comment through December 2007. The city responded in writing to the comments and made further revisions to the draft EIR. The city concluded some comments it had received on the draft revised EIR were beyond the scope of the revisions and barred by res judicata. Therefore, no substantive response was provided.

In March 2008, the city published the final revised EIR, which consisted of comments on the draft revisions to the 2004 EIR and the written responses to the comments.

In October 2008 at a public hearing, the planning commission considered the final revised EIR and the project. At the beginning of the hearing, the city's special counsel hired for this CEQA litigation stated the commission was limited to reviewing the five areas of the EIR the city updated either voluntarily or by court order. The commission declined to certify the final revised EIR because it lacked sufficient detail. The commission took no action on the project itself.

In December 2008, the city council heard appeals by Browman Company and Wal-Mart. After a public hearing on the appeals, the city council voted to overturn the planning commission and voted to certify the final revised EIR. However, allegations of Ralph M. Brown Act[1] violations at that hearing (not relevant here) led the city council to hold a second public hearing in March 2009.

In March 2009, the second public hearing was held to reconsider the appeals. At the beginning of the hearing, the community development director stated the discussion was limited to the five areas of the EIR the city updated either voluntarily or by court order. The city council voted to certify the final revised EIR.

Following certification, the planning commission reviewed Browman Company and Wal-Mart's request to approve the project.

In April 2009, a motion to approve the project resulted in a tie among the commissioners, which meant a denial of the project. Browman and Wal-Mart

---

[1] Government Code section 54950 et seq.

appealed the denial. Lodi First also appealed because the commission "did not make any affirmative denial of the Project."

In May 2009, the city council held a public hearing on the appeals. The council conditionally approved the project entitlements and adopted the findings of fact and statement of overriding considerations for the project.

E

*Trial Court Litigation Regarding Discovery and the 2008 Final Revised EIR*

In June 2009, the city filed a petition to discharge the writ in *Lodi First I*. As part of its return to the writ of mandate, the city lodged the supplemental administrative record.

In June 2009, Citizens and Lodi First each filed separate lawsuits (*Citizens II* and *Lodi First II*) challenging the 2008 final revised EIR. In October 2009, *Citizens II, Lodi First II*, and the petition to discharge the writ in *Lodi First I* were partially consolidated.

After these lawsuits were filed, both Citizens and Lodi First sent letters to Wal-Mart and Browman Company contending the supplemental administrative record excluded documents, including internal agency communications and communications with city consultants. In response, the city, among other things, prepared a log of documents it claimed were privileged and augmented the supplemental administrative record with other documents. Still believing it was due other documents, Citizens filed a motion to augment the administrative record in which Lodi First joined. In December 2009, the court granted the motion in part. The court denied the motion in part because some documents were privileged under the attorney-client privilege, the attorney work product doctrine, and/or the deliberative process doctrine. Finally, following an in camera inspection of 27 e-mails the city claimed were protected by the deliberative process privilege, the court ordered five produced.

The hearing on the merits of the coordinated actions was held in February 2010. In May 2010, the court granted the city's request to discharge the December 2005 writ in *Lodi First I* and denied the petitions in *Citizens II* and *Lodi First II*.

Following judgment, Citizens filed a notice of appeal from *Citizens II* and Lodi First filed an appeal from *Lodi First II*. Lodi First also appealed from the order discharging the writ in *Lodi First I*.

DISCUSSION

I

*Challenge to the Administrative Record*

Lodi First and Citizens raise three challenges to the administrative record. One, Lodi First contends the court erred in applying the deliberative process privilege to exclude from the administrative record 28[2] e-mails between the city's staff and their consultants regarding preparation of the revised EIR. Two, Citizens contends the trial court "erred by not separately considering documents attached to emails." And three, Citizens contends the court abused its discretion in holding that nine e-mails between the city and Wal-Mart/Browman Company's attorneys were privileged.

A

*The Deliberative Process Privilege*

■ "Under the deliberative process privilege, senior officials of all three branches of government enjoy a qualified, limited privilege not to disclose or to be examined concerning not only the mental processes by which a given decision was reached, but the substance of conversations, discussions, debates, deliberations and like materials reflecting advice, opinions, and recommendations by which government policy is processed and formulated." (*Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 540 [85 Cal.Rptr.2d 257, 976 P.2d 808], superseded by statute on another point in *Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 915 [117 Cal.Rptr.2d 631].)

Lodi First contends the court erred in applying the deliberative process privilege to exclude from the administrative record 28 e-mails (really 22 e-mails) between the city's staff and their consultants regarding preparing the revised EIR.

Lodi First has four arguments why the privilege does not apply here. One, the introductory language to the statute delineating the contents of the

---

[2] Lodi First contends the city withheld 28 documents based on the deliberative process privilege. The court considered 27 of them in its tentative ruling. This was likely because the court's review of the documents was based on a statement in a declaration from the attorney representing the city that its privilege log identified 27 e-mails covered by the deliberative process privilege. In actuality, the privilege log identified 28 such e-mails. Lodi First has not shown us where it objected during the tentative ruling the court had missed one document. Of the 27 reviewed, the court ordered five disclosed. Therefore, at issue now are 22 documents.

administrative records in CEQA cases that states, *"Notwithstanding any other provision of law*, . . . [¶] . . . [¶] (e) [t]he record of proceedings shall include, but is not limited to, all of the following items: [¶] . . . [¶] (7) All written evidence or correspondence submitted to, or transferred from, the respondent public agency with respect to compliance with this division or with respect to the project." (Pub. Resources Code, § 21167.6, italics added.) As Lodi First sees it, the "[n]otwithstanding any other provision of law" language abrogates the deliberative process privilege here. Two, the deliberative process privilege "appears" not to apply to quasi-judicial decisions. As Lodi First sees it, "the [c]ity was not enacting broad policy in approving the [p]roject, but rather was applying established policy to a specific development proposal." Three, the privilege did not apply to certain e-mails that postdated the release of the final revised EIR in August 2008. And four, "the public interest in full disclosure outweighs any interest in nondisclosure." As Lodi First sees it, the city failed to make "the detailed and specific showing required to establish its privilege claim." Given the record here, we find the fourth argument persuasive and do not reach the others.

■ This court has explained the showing that must be made by the one claiming the deliberative process privilege: "Not every disclosure which hampers the deliberative process implicates the deliberative process privilege. Only if the public interest in nondisclosure clearly outweighs the public interest in disclosure does the deliberative process privilege spring into existence. ■ The burden is on the [one claiming the privilege] to establish the conditions for creation of the privilege. The trial court's determination is subject to de novo review by this court, although we defer to any express or implied factual findings of the superior court." (*California First Amendment Coalition v. Superior Court* (1998) 67 Cal.App.4th 159, 172–173 [78 Cal.Rptr.2d 847].)

In the trial court, the city's argument for why the privilege applied here was as follows: "[T]he City Manager, City Attorney, Community Development Director, outside counsel, and expert EIR consultants engaged in various deliberative discussions and document exchanges concerning the Project and the [revised] EIR. In order to foster candid dialogue and a testing and challenging of the approaches to be taken, those discussions are appropriately exempt from disclosures under the deliberative process privilege . . . ." In response, Lodi First argued the city had "at no point demonstrated that the public's interest in nondisclosure outweigh[ed] the public's interest in disclosure of these documents. . . . [¶] To the extent that the communications reveal a dispute among the experts, specifically the economic consultants retained by the City and the economic consultants retained by Lodi First, they should be disclosed pursuant to guidelines Section [15151] . . . . " Without comment, the trial court found the deliberative process privilege applied to 22 of them.

In this court, Lodi First claims the city's "naked assertion" that disclosing staff communications would "hamper 'candid dialogue and a testing ' and challenging of the approaches to be taken' " is not sufficient to demonstrate the public interest in nondisclosure clearly outweighs the public interest in disclosure. The city's response on appeal to Lodi First's appellate argument is the following one line: "Lodi First's argument flies in the face of well settled law affirming the strong public policy underlying the need for the deliberative process privilege."

Lodi First is correct the city never established the conditions for creation of the privilege. The city's explanation in the trial court of why the privilege applies, i.e., to "foster candid dialogue and a testing and challenging of the approaches to be taken," was simply a policy statement about why the privilege in general is necessary. Indeed, the city's explanation was similar to one of the policy reasons for the deliberative process privilege enunciated by this court: the privilege " 'protects creative debate and candid consideration of alternatives within an agency, and, thereby, improves the quality of agency policy decisions.' " (*California First Amendment Coalition v. Superior Court, supra*, 67 Cal.App.4th at p. 170.) While the policy behind the privilege makes sense, invoking the policy is not sufficient to explain the public's specific interest in nondisclosure of the documents in this case. That policy could apply to almost any decisionmaking process. The city therefore failed to carry its burden to explain what the public's specific interest in nondisclosure was *in this case.*[3] (*California First Amendment Coalition v. Superior Court, supra*, 67 Cal.App.4th at p. 172.) The city also failed to carry its burden to explain why the public's interest in nondisclosure in this case "clearly outweigh[ed]" the public interest in disclosure. (*Ibid.*) Because the city failed to carry its burden, the court erred in excluding 22 e-mails from the administrative record based on the deliberative process privilege.

The question then becomes prejudice. Lodi First argues in its opening brief that "because an EIR is presumed adequate and a petitioner bears the burden of proving error in light of the whole record . . . an incomplete record prevents the petitioner from meeting its burden." In light of Lodi First's

---

[3] To put the deficiency of the city's explanation in context, we set forth two examples of explanations that have been found to be adequate.

In one case, the Governor properly refused a request to disclose his daily, weekly and monthly appointment calendars and schedules because disclosure of the records "would inhibit access to the broad spectrum of persons and viewpoints which he requires to govern effectively." (*Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325, 1329, 1339 [283 Cal.Rptr. 893, 813 P.2d 240].)

In another case, the Governor was not required to disclose the names and qualifications of applicants for a temporary appointment to a local board of supervisors because "[d]isclosure would likely reduce the applicant pool and the candor of those who apply." (*California First Amendment Coalition v. Superior Court, supra*, 67 Cal.App.4th at pp. 164, 172.)

argument, we requested the parties brief the following issue: "Assume the trial court erred in excluding certain allegedly privileged documents from the administrative record. As a practical matter, is the issue not amenable to appellate review (and therefore more properly raised by writ review) because appellant lacks the ability to demonstrate prejudicial error as it has not seen the documents that were erroneously excluded?" As we will now explain, applying well-established appellate rules, we hold reversal is not required because Lodi First has failed to meet its burden to show prejudicial error in the trial court's exclusion of these e-mails from the administrative record.

"No judgment shall be set aside . . . in any cause, on the ground of . . . the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) Under this standard, the appellant bears the burden to show it is reasonably probable he or she would have received a more favorable result at trial had the error not occurred. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Here, Lodi First's opening brief acknowledges it cannot satisfy its burden to prove prejudice on appeal because of the "incomplete record," i.e., because it has not seen the documents that were erroneously withheld.

In its supplemental brief, however, Lodi First claims that respondents' act of improperly withholding the documents "is itself prejudicial." In support, it quotes the maxim of jurisprudence, "[t]he law never requires impossibilities" (Civ. Code, § 3531), and argues that requiring Lodi First "to prove prejudice without ever having seen the improperly withheld documents imposes an *impossible* burden on CEQA petitioners." Not so.

█ The answer to Lodi First's predicament was to seek writ review of the trial court's December 14, 2009, ruling on the motion to augment the administrative record, in which the court determined the deliberative process privilege applied. " ' "[W]hen the remedy by appeal is rendered inadequate in the context of a specific case, this court may, in its discretion, permit an aggrieved party to bypass the appellate process and pursue extraordinary relief." ' " (*Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095, 1098 [97 Cal.Rptr.2d 382].) Specifically, writ review of a discovery ruling is appropriate if "an order prevents a party from having a fair opportunity to litigate his or her case." (*Waicis v. Superior Court* (1990) 226 Cal.App.3d 283, 286–287 [276 Cal.Rptr. 45].) Here, Lodi First could have sought writ review of the court's ruling improperly excluding documents based on the deliberative process privilege by arguing that review by appeal was inadequate. It was inadequate because without having seen the documents, Lodi First could not carry its burden on appeal to show prejudice.

Lodi First, however, contends that "the incomplete record itself is a prejudicial error that requires reversal, *regardless* of the actual contents of the withheld documents." In support, it primarily cites *Protect Our Water v. County of Merced* (2003) 110 Cal.App.4th 362 [1 Cal.Rptr.3d 726]. That case holds nothing of the sort. There, the administrative record which was contained in "14 binder-sized volumes . . . read[] as if its preparers randomly pulled out documents and threw them into binders, failing to organize them either chronologically or by subject matter. Key findings required under CEQA [we]re impossible to find—let alone sufficient to enable [the appellate court] to determine whether they are supported by substantial evidence." (*Id.* at p. 365.) "Because [the appellate court] c[ould ]not discern the required findings under CEQA, [it] reversed the judgment." (*Id.* at p. 373.)

In contrast, the missing documents here do not deprive us of our ability to review the judgment. Rather, their exclusion deprived Lodi First of the opportunity to review 22 e-mails between the city staff and EIR consultants to determine whether those documents could have bolstered the analysis of the arguments it was going to make on appeal. To remedy that deprivation, however, Lodi First could have sought writ review to avoid the predicament in which it finds itself now, i.e., the inability to carry its burden to demonstrate prejudice.

Taken to its extreme, Lodi First's position is that anytime even one insignificant document is erroneously excluded from the administrative record, reversal is required. This is not the law. For example, in a recent case, the Court of Appeal, Fifth Appellate District, held that even assuming a comment letter was erroneously excluded from the administrative record, its exclusion "d[id] not constitute reversible error because its exclusion resulted in no prejudice to plaintiffs. . . . Stated otherwise, the outcome of this appeal would have been the same as the outcome reached had the . . . comment letter never been written or had the letter been included in the administrative record." (*Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, 75 [131 Cal.Rptr.3d 626].)

In that case, the content of the letter was known to all parties because the commenter had submitted the letter regarding the draft EIR for all the parties to see but then the commenter requested the letter be withdrawn. (*Madera Oversight Coalition, Inc. v. County of Madera, supra,* 199 Cal.App.4th 48, 75, fn. 12.) Therefore, each party could make its own arguments regarding whether exclusion of the letter from the administrative record was or was not prejudicial. Here, we will not stand in the shoes of Lodi First and determine without input from the parties whether the error in excluding these documents was prejudicial where there was another route by which Lodi First could have

obtained the erroneously excluded documents and made its own argument as to why the error in excluding the documents was prejudicial.[4]

We conclude by addressing Lodi First's argument that we treat its appeal as a petition for extraordinary writ. We will not exercise our discretion to treat this appeal as a writ petition. "As a general rule, a writ petition should be filed within the 60-day period that is applicable to appeals. [Citations.] 'An appellate court *may* consider a petition for an extraordinary writ at any time [citation], but has discretion to deny a petition filed after the 60-day period applicable to appeals, and *should* do so absent "extraordinary circumstances" justifying the delay.' " (*Volkswagen of America, Inc. v. Superior Court* (2001) 94 Cal.App.4th 695, 701 [114 Cal.Rptr.2d 541].)

Here, the 60-day period applicable to appeals has long since lapsed. The trial court made its final determination excluding the allegedly privileged documents from the administrative record on December 14, 2009, when it ruled on the motion to augment the administrative record.

There is no extraordinary circumstance justifying the delay. Lodi First claims there is because nothing in the law "hints or holds that review by way of extraordinary writ is the *only* means available for reviewing a record dispute under CEQA." As an example, Lodi First cites this court's decision in *California Oak Foundation v. County of Tehama* (2009) 174 Cal.App.4th 1217 [94 Cal.Rptr.3d 902]. There, an environmental group appealed after the trial court denied its petition for writ of administrative mandamus to overturn approval of a project and associated EIR. (*Id.* at pp. 1219–1220.) The appeal included a challenge to the trial court's order denying the group's motion for an order to compel the city to include in the administrative record four letters from the city's outside counsel the city believed were protected by the attorney-client privilege and the work product privilege. (*Id.* at pp. 1220–1221.) Our court disagreed and found the privileges applied. (*Id.* at p. 1221.)

Nothing in *California Oak Foundation* undermines the position we take here. There, our court never reached the issue of prejudice from the excluded

---

[4] We will also not, as Lodi First suggests, "conditionally reverse and remand to the trial court to afford Lodi First the opportunity to establish prejudice." In support of such an outcome, Lodi First cites *People v. Gaines* (2009) 46 Cal.4th 172 [92 Cal.Rptr.3d 627, 205 P.3d 1074]. *Gaines* involved the procedure by which a criminal defendant is entitled to discovery of information in the confidential personnel records of a peace officer when that information is relevant to defend against a criminal charge. (*Id.* at p. 176.) Lodi First has not demonstrated why that procedure would be applicable here. In any event, application of that procedure here where Lodi First had an immediate avenue for challenging the erroneous ruling and did not would foster unnecessary delay the law cautions against in CEQA cases. (See, e.g., *County of Orange v. Superior Court* (2003) 113 Cal.App.4th 1, 12 [6 Cal.Rptr.3d 286].)

documents because there was no error in excluding them in the first place. (*California Oak Foundation v. County of Tehama, supra*, 174 Cal.App.4th at p. 1221.)

As another example, Lodi First cites *County of Orange v. Superior Court, supra*, 113 Cal.App.4th 1. There, the county and the developer filed a writ petition in the appellate court from the trial court's ruling excluding from the administrative record both an addendum which consisted of about 1,100 pages and miscellaneous county documents which consisted of 700 additional pages relating to that addendum. (*Id.* at pp. 1, 7.) The project opponents claimed this evidentiary ruling should not be reviewed by writ petition. (*Id.* at p. 11.) The appellate court held "[u]nder the circumstances of this case, a peremptory writ in the first instance, as requested in the petition, is appropriate." (*Id.* at p. 13.) The appellate court noted, "the rule against writ review of evidentiary matters is not absolute. . . . [T]he rule would not apply ' " 'when the remedy by appeal is rendered inadequate in the context of a specific case.' " ' " (*Id.* at pp. 11–12.)

*County of Orange* supports our conclusion here. The case cited the Legislature's recognition "that, particularly in the CEQA context, time is money. The name of the game may be, from the project opponent's point of view, to spot the inadequacy in the EIR, but the game itself must be played quickly. [¶] Let us assume, [the exclusion of materials] is an error that must be corrected by way of the remedy of appeal. That doesn't necessarily mean the appeal will be an adequate remedy. To build guaranteed delay into the process is to guarantee that the project opponents will prevail to the extent of delaying the project, which itself must necessarily be one of their goals. The Legislature has obviously structured the *legal process* for a CEQA challenge to be speedy, so as to prevent it from degenerating into a guerilla war of attrition by which project opponents wear out project proponents. . . . [¶] Realistically, we expect an appeal from whatever decision the trial court makes. . . . *That* appeal is part of the rules of the game. But it is not within the rules to build into the legal process the probability of *two* appeals . . . ." (*County of Orange v. Superior Court, supra*, 113 Cal.App.4th at pp. 12–13.)

■ In sum, where Lodi First chose to proceed on appeal and demonstrated respondents had not carried their burden of showing that the 22 documents excluded from the administrative record were indeed covered by the deliberative process privilege, Lodi First cannot claim it is impossible to demonstrate prejudice (for its lack of ability to see the documents) because Lodi First created its own predicament by failing to seek writ review. An appellant's burden to prove prejudicial error is well established. Indeed, it is part of our state's Constitution. Because Lodi First has failed to carry that burden, it is not entitled to reversal on appeal.

B, C*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II

*There Was Sufficient Evidence of a Reasonable Range of
Alternatives in the Revised EIR*

Lodi First contends the revised EIR did not comply with CEQA guidelines because the range of alternatives to the project did not both satisfy most of the project objectives *and* reduce significant effects of the project. Lodi First bases this argument on an isolated portion of California Code of Regulations, title 14, section 15126.6, subdivision (a),[5] which states, "An EIR shall describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives."

The problem with Lodi First's argument is it ignores the overriding principle in the guideline, which states: "There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason." (CEQA Guidelines, § 15126.6, subd. (a).)[6]

■ Our Supreme Court has explained how the rule of reason fits into the assessment of alternatives to the proposed project. (*Citizens of Goleta Valley v. Board of Supervisors, supra,* 52 Cal.3d at p. 565.) "In determining the nature and scope of alternatives to be examined in an EIR, the Legislature has

---

*See footnote, *ante,* page 296.

[5] Hereafter, we will refer to the CEQA guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.) in the format "CEQA Guidelines section ___."

[6] CEQA Guidelines section 15126.6, subdivision (a) reads in full: "Alternatives to the Proposed Project. An EIR shall describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives. An EIR need not consider every conceivable alternative to a project. Rather it must consider a reasonable range of potentially feasible alternatives that will foster informed decisionmaking and public participation. An EIR is not required to consider alternatives which are infeasible. The lead agency is responsible for selecting a range of project alternatives for examination and must publicly disclose its reasoning for selecting those alternatives. There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553 [276 Cal.Rptr. 410, 801 P.2d 1161] and *Laurel Heights Improvement Association v. Regents of the University of California* (1988) 47 Cal.3d 376 [253 Cal.Rptr. 426, 764 P.2d 278].)"

decreed that local agencies shall be guided by the doctrine of 'feasibility.' '[I]t is the policy of the state that public agencies should not approve projects as proposed if there are *feasible alternatives* or *feasible mitigation measures* available which would substantially lessen the significant environmental effects of such projects . . . . [I]n the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects thereof.' [Citation.] [¶] . . . Both the California and the federal courts have further declared that '[t]he statutory requirements for consideration of alternatives must be judged against a rule of reason.' " (*Citizens of Goleta Valley*, at p. 565.)

Applying the foregoing, we find substantial evidence there was a reasonable range of alternatives in the revised EIR, even though the revised EIR stated (after an exhaustive review of a range of alternatives which we detail below) there was no alternative that would feasibly attain most of the basic objectives of the project and would also avoid or significantly reduce impacts associated with the proposed project to less-than-significant levels. (See *Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 934 [99 Cal.Rptr.3d 621] [standard of review].) Below we detail the alternatives discussed in the revised EIR.

The revised EIR considered five alternatives: (1) no project; (2) alternative land uses; (3) reduced density; (4) reduced project size; and (5) alternative project location.

The revised EIR briefly discussed alternative land uses and reduced project density but did not consider them for further evaluation. Alternative land uses for the project site (such as commercial office space or residential) were not considered for further evaluation because the project site is within the commercial shopping zoning district, the stated purpose of which was to develop commercial shopping facilities outside the central business district. Residential development was specifically prohibited. Reduced project density was not considered for further evaluation because it would be economically infeasible.

The rejection of these alternatives for further review was reasonable. (See *Citizens of Goleta Valley v. Board of Supervisors, supra,* 52 Cal.3d at pp. 566–567 [an appellate court reviews for substantial evidence the conclusion certain alternatives do not merit extended discussion in the EIR].) There was no point in further discussing alternative uses for the land (besides agricultural use) because the site was zoned only for a particular use, i.e., commercial shopping facilities. There was also no point in further discussing a reduced density project for the site because a developer would not undertake such a project because it was not economically viable.

Thus, the three remaining alternatives were (1) no project; (2) reduced project size; and (3) alternative project location. There was a detailed discussion of each in the revised EIR.

The no project alternative focused on the no build scenario and the land possibly reverting to use for cultivating oats, hay, or row crops. After a comprehensive analysis, this alternative was not selected because it would not fulfill the project objectives of developing a shopping center, fulfilling unmet retail demands of Lodi residents, enhancing the city's fiscal resources through sales and property taxes, creating new jobs, or reversing retail sales leakage.

The reduced project size alternative focused on having only a Wal-Mart Supercenter without the other retail pads. After a comprehensive analysis, this project was not selected because it would not "entirely fulfill" the project objective of developing a project site with a regional shopping center, it would be "substantially less effective" than the proposed project in fulfilling unmet retail demands, enhancing the city's fiscal resources through sales and property taxes, creating new jobs, or reversing retail sales leakage.

The alternative project location focused on an unincorporated area of San Joaquin County at the northeast quadrant of Highway 12 and Thornton Road referred to as the Flag City site. After a comprehensive analysis, this alternative was not selected because it would not fulfill the project objective of developing the proposed project site in conformance with the city's general plan and zoning regulations, it could impede the city's objective of creating local jobs and increasing the local tax base, and it would likely exacerbate current retail sales "leakage."

These three alternatives discussed in detail in the revised EIR provided substantial evidence of a reasonable range of alternatives. " '[W]hat is required is the production of information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned. . . . [¶] When the alternatives have been set forth in this manner, an EIR does not become vulnerable . . . .' " (*Laurel Heights Improvement Assn. v. Regents of University of California, supra*, 47 Cal.3d 376, 406–407.) The revised EIR met these standards. It explained that of the three project alternatives considered in detail, only the no project alternative would avoid or substantially lessen the significant impacts of the project and would therefore be the "environmentally superior project." However, because it did not meet the applicant's objective or the city's goals, the reduced project size alternative would be the next "environmentally superior alternative." While it resulted in the same impacts to agricultural resources and air quality as the project, it would result in slightly lower levels of impact in several impact categories. Ultimately, though, it was not selected by the applicant because it would not

"entirely fulfill" the project objective and would be "substantially less effective" in meeting the city's goals. On this record, Lodi First's challenge to the range of alternatives in the revised EIR lacks merit.

## III

### *Urban Decay*

In December 2005, the trial court granted the petition for writ of mandate in *Lodi First I,* holding that the 2004 EIR was inadequate under CEQA because, among other things, the analysis of cumulative urban decay impacts was "defective." The court explained "[t]he cumulative impact analysis in the EIR is legally defective because the City . . . understat[ed] the potential economic impact of the proposed project upon existing competing businesses in Lodi." It omitted from the cumulative urban decay analysis two Stockton Wal-Mart Supercenter projects that were within the geographical area from which the EIR anticipated the project would draw customers.

In October 2007, Bay Area Economics prepared an economic impact/urban decay analysis in response to the trial court's December 2005 order decertifying the previous EIR because the cumulative impact analysis for the urban decay was inadequate. The analysis was undertaken to "address these concerns, and to bring up-to-date the analysis in light of any additional changes in market conditions since the original analysis was completed in July 2004."

In March 2008, Pacific Municipal Consultants prepared an addendum to the revised EIR containing comments received on the draft revised EIR and response to those comments. The addendum, together with the draft revisions to the EIR constituted the final revisions to the EIR.

\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## A

### *The Revised EIR Did Not Need to Address Urban Blight Conditions Addressed in the Redevelopment Agency Documents*

"An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of

---

\*See footnote, *ante,* page 296.

preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant." (CEQA Guidelines, § 15125, subd. (a).)

Lodi First contends the revised EIR inaccurately described the project's environmental setting because it "inexplicably fail[ed] to discuss existing blight and decay conditions in east Lodi," although these conditions were identified in redevelopment agency documents.[7] Thus, according to Lodi First, the revised EIR "thwart[ed] informed decisionmaking regarding the significance of the [p]roject's urban decay impacts . . . ."

Lodi First presents a question of law we review de novo, i.e., whether the city failed to comply with CEQA by failing to discuss existing blight conditions in east Lodi. (See *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1207–1208 [22 Cal.Rptr.3d 203] [standard of review].)

There was nothing "inexplicabl[e]" about the revised EIR's failure to discuss blight conditions in east Lodi because blight is different than urban decay. (See *Bakersfield Citizens for Local Control v. City of Bakersfield, supra*, 124 Cal.App.4th at p. 1204, fn. 4.)

The issue of the revised EIR's failure to address existing blight in the redevelopment areas, i.e., east Lodi, was raised in a December 2008 memo written by economics professors Philip and Sharmila King (the King memo). Bay Area Economics responded in its own memo (that was attached as an appendix to the revised EIR) that blight was different than urban decay. "[T]he King memorandum wrongly and repeatedly confuses urban decay of the retail landscape due to new retail development . . . , which is the subject of CEQA analysis, with blight, which has a specific meaning in the context of redevelopment and which often does not correspond to urban decay." "While the [r]edevelopment [a]gency may have blighted conditions, this blight is not necessarily related to the retail environment at all; for example, deteriorated residential structures may be blighted but this does not constitute an existing condition with respect to the retail environment." For these reasons, the *baseline* in the revised EIR did not have to include a discussion about blight in east Lodi.

---

[7] The redevelopment documents to which Lodi First points include a city-directed feasibility study for a potential redevelopment project in east Lodi. The study was dated October 29, 2007. The study evaluated existing conditions in east Lodi using "blight" as the standard. The study explained vacant units were observed through east Lodi. Their "[p]oor physical conditions lead[s] to decreased values and sales, which, in turn, lead[s] to poor economic conditions."

We note one other point. Although blight was not mentioned in the revised EIR's baseline, the revised EIR did analyze deteriorated properties in east Lodi and the proposed project's effect on those properties. As the trial court found in response to a similar argument Lodi First made there, the revised EIR from March 2008 "extensively analyze[d] the potential for urban decay *with* consideration of . . . conditions in east Lodi. In fact, there is a specific discussion in which the redevelopment area is discussed."

The specific discussion was in response to a question about "how the establishment of the redevelopment area planned for the east side of Lodi will be affected by added competition from the proposed project?" The response was located in the addendum to the revised EIR from March 2008. The response explained as follows: Specifically, the proposed redevelopment project area would cover "much of the east side of Lodi" and included "the deteriorated properties on both sides of Sacramento [Street] . . . ." The city was in the process of forming its redevelopment agency, and therefore it was "premature to evaluate with any degree of certainty how the proposed [r]edevelopment [p]roject [a]rea would be affected by the proposed Lodi Shopping Center project." "However, the analysis in the [Bay Area Economics] study and the [draft revised EIR] found that within the planned [r]edevelopment [p]roject [a]rea, the only store which is at risk of closure due to the introduction of the Lodi Shopping Center is the Kmart on Cherokee Lane. However, the Cherokee center property owner indicated that Kmart was in a very low-cost long-term lease, and even if Kmart vacated the property, the space would be re-tenanted, perhaps with a non-retail use . . . ." There were no known commercial retail projects proposed for the redevelopment project area. The only known proposed project for the east side, the Reynolds Ranch project, was outside the redevelopment project area. The cumulative impacts of the Reynolds Ranch project and the Lodi shopping center project were the possible closing of retailers on the west side, such as Mervyn's and JCPenney. "[I]t [wa]s unlikely that such closures would result in urban decay, even under reasonable worst-case conditions, because . . . of the City's express commitment to undertake diligent code enforcement actions to prevent physical deterioration of vacated commercial properties."

Based on the state of the record, we hold the baseline in the revised EIR did not have to take into account blight in east Lodi and the body of the revised EIR did account for urban decay conditions in east Lodi.

## B

### *The Revised EIR Considered the Entire Project**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## C

### *The City Did Not Abuse Its Discretion in Maintaining the Economic Baseline from Years 2006 to 2007 and Therefore Not Updating That Baseline to Account for the Declining Economy*

Citizens contends the city erred in "fail[ing] to assess [urban decay] impacts under radically changed economic conditions." Specifically, it argues the city should have reassessed urban decay impacts in light of the economic recession that occurred after Bay Area Economics did its economic analysis using research from late 2006 and early 2007. As we explain, the city's decision not to update the economic baseline in the 2007 draft EIR was not an abuse of discretion.

The city issued a notice of preparation for the revised EIR in November 2006. The economic impact/urban decay analysis prepared by Bay Area Economics in October 2007 (which was part of the revised EIR) used late 2006 and early 2007 as the research baseline. Among other things, the analysis noted that San Joaquin County "ha[d] shown very strong retail sales growth, with a 78 percent increase in taxable retail sales" from 1995 to 2005, "even though population only increased 27 percent." Total employment had increased "every year since 2000" and "[t]his growth in employment indi-cate[d] fundamental strength in the region's economy, a[rguing] well for consumer confidence and retail expenditures."

The issue of updating this and similar economic information in the revised EIR, i.e., the baseline economic conditions, arose in the December 2008 King memo. The King memo argued the "current housing/foreclosure crisis w[as] hav[ing] a profound impact on retail and exacerbat[ing] existing urban decay in Lodi" that the revised EIR should have addressed. After receiving a response to the King memo that took the form of a memo from Bay Area Economics, the city decided not to update the economic baseline.

We review the city's decision not to update the baseline for an abuse of discretion, which here is a question of whether that decision was supported

---

*See footnote, *ante*, page 296.

by substantial evidence. (See *Fat v. County of Sacramento* (2002) 97 Cal.App.4th 1270, 1272–1273 & fn. 2, 1277 [119 Cal.Rptr.2d 402] [standard of review].) The city's decision was supported by substantial evidence because there was evidence that, one, updating the baseline was problematic because of rapidly changing economic conditions, and two, the rapidly changing economic conditions did not affect the urban decay findings.

One, the response memo from Bay Area Economics explained the problem with updating the baseline: "the turmoil in the economy make[s] any kind of long term predictions difficult, and any further analysis by [Bay Area Economics] could be subject to a 'moving target' problem, where the updates to the analysis would not be able to keep pace with events." The King memo "f[ell] prey to this problem; [it] discuss[ed] the Mervyns closure, which [the King memo] highlighted as an example of a property at risk for urban decay. Within a few days of the King [memo], Kohl's announced it was taking over this store site along with many other former Mervyns sites." This example demonstrated, "even in the current economy, retailers see opportunities for growth in Lodi."

Two, the response memo from Bay Area Economics explained why changing economic conditions did not alter its findings regarding urban decay: "the economic downturn [wa]s likely to stall or slow other pipeline retail projects." Thus, "the market will adjust to the slowdown by slowing down the pace of overall retail real estate development."

In light of this evidence, the city did not abuse its discretion in not updating the economic baseline.

## D

*There Was Substantial Evidence to Support the City's Code Enforcement as a Mitigation Measure for Urban Decay**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV

*The 2004 EIR and the Revised EIR Adequately Analyzed the Project's Agricultural Impacts*

Citizens contends the EIR and revised EIR failed to adequately analyze agricultural impacts in two respects. One, there was no "good faith disclosure

---

*See footnote, *ante*, page 296.

of cumulative impacts to agriculture." Two, there was no "substantial evidence" to support the rejection of a "heightened mitigation ratio." Citizens is wrong on both points.

A

*The EIR and Revised EIR Contained a Good Faith*
*Disclosure of the Project's Cumulative Impacts to*
*Agriculture*

■ "An EIR shall discuss cumulative impacts of a project when the project's incremental effect is cumulatively considerable . . . ." (CEQA Guidelines, § 15130, subd. (a).) " 'Cumulative impacts' refer to two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts." (CEQA Guidelines, § 15355.) While technical perfection in a cumulative impact analysis is not required, courts have looked for " 'adequacy, completeness, and a good faith effort at full disclosure.' " (*Mountain Lion Coalition v. Fish & Game Com.* (1989) 214 Cal.App.3d 1043, 1052 [263 Cal.Rptr. 104].)

The EIR and revised EIR here satisfied these standards. As we will demonstrate, together they explained the amount of prime farmland lost due to the project, the amount of land (either in square feet or residential units) lost due to the project and other proposed projects as of 2004, and that the cumulative impacts to agricultural resources would be significant and unavoidable.

The 2004 draft EIR stated the project "would convert approximately 40 acres of prime agriculture land to urban use . . . . [N]o mitigation is available which would reduce this impact to a less-than-significant level except an outright prohibition of all development on prime agricultural lands." The cumulative impacts section included (1) a table listing 19 approved developments and included their size in square footage or, if it was a residential development, the number of units,[10] and (2) a statement that a major annexation application had been filed with the city for an additional 320 acres

---

[10] Citizens argues reliance on this table is unwarranted for three reasons. None of these arguments undermines the good faith effort at full disclosure.

One, Citizens contends the table was nearly four years out of date and therefore excluded major "recent developments" such as the Reynolds Ranch project. Citizens, however, cites no law requiring the table be updated, especially in light of the trial court's ruling finding the EIR's agricultural impacts analysis sound.

Two, Citizens contends the trial court found the table inadequate in the *Lodi First I* litigation because the table did not include "nearby developments." This contention is misleading because the trial court did not find the table inadequate for failure to disclose loss of

adjacent to the proposed project site known as the Southwest Gateway Annexation. In the discussion of "agricultural resources," the EIR noted that much of the land in these areas was "prime farmland" and the development of this land "would involve significant and unavoidable impacts to agricultural resources. The incremental loss of prime farmland at the project site would contribute to this impact which would be cumulatively considerable." The trial court found the EIR's agricultural resources section to be legally sufficient under CEQA.

The October 2007 revised draft EIR added to this section. Under the heading "[c]umulative [i]mpacts," the revised draft EIR further explained, among other things, "other pending and approved projects in the City of Lodi Sphere of Influence would result in the conversion of prime farmland to urban uses. While the larger projects would be required to acquire or pay fees toward the acquisition of agricultural easements, this would not likely be required of smaller projects . . . . In any event, it is not feasible to fully mitigate for the loss of prime farmland, short of denying all proposed development projects. Thus[,] cumulative impacts to agricultural resources would be partially mitigated but not to a less-than-significant level. Therefore, the cumulative impacts to agricultural resources would be significant and unavoidable."

Despite the EIR and revised EIR's disclosure detailed above, Citizens claims case law supports a finding here the disclosure was inadequate. The cases it cites, however, are distinguishable. (See, e.g., *Whitman v. Board of Supervisors* (1979) 88 Cal.App.3d 397, 409 [151 Cal.Rptr. 866] [a one-sentence cumulative impact analysis that cryptically and misleadingly mentioned two other pending projects insufficient]; *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 733 [32 Cal.Rptr.2d 704] [failure to note loss of prime farmland resulting from required sewer expansion due to the project led to an insufficient analysis of the combined environmental effects of the proposed development]; *Mountain Lion Coalition v. Fish & Game Com., supra*, 214 Cal.App.3d at p. 1051 [a

agricultural land. It found a portion of the urban decay cumulative impacts analysis deficient because it did not disclose the existence of two other Wal-Mart Supercenters in Stockton that could potentially contribute to urban decay.

And three, Citizens contends the table provided no actual detail of the amount of prime farmland converted to gauge cumulative impacts. This is not true. As even Citizens concedes, the table listed the developments and proposed developments in terms of square feet or, in the case of residential developments, in terms of number of units. There is no requirement the information be presented in any particular format, such as number of acres of farmland lost due to each development. All that is required is " 'adequacy, completeness, and a good faith effort at full disclosure.' " (*Mountain Lion Coalition v. Fish & Game Com., supra*, 214 Cal.App.3d at p. 1052.) Citizens has not demonstrated the disclosure here did not meet these standards.

draft environmental impact document that overlooked significant environmental issues brought to appellants' attention through the public comment process was insufficient].) Citizens has not demonstrated the EIR's here suffer from these types of deficiencies.

B

*The City Did Not Have to Accept Citizens' Heightened
Mitigation Ratio*

The October 2007 draft EIR stated the project would convert approximately 40 acres of prime agricultural land to urban uses. It then explained there was no mitigation that would reduce this impact to a less-than-significant level (except an outright prohibition on all development on prime agricultural land) because the land "once converted, loses its character as agricultural land and is removed from the stock of agricultural land."

Because there was no mitigation that would reduce this impact to a less-than-significant level, the city adopted a statement of overriding considerations. In that statement, the city explained that while there were "no feasible mitigation measures available that would avoid the significant loss of agricultural land if the project wa[s] implemented" (boldface omitted), "[t]he acquisition of an off-site agricultural conservation easement would provide partial mitigation." The city then required the applicant to "obtain a permanent [a]gricultural [c]onservation [e]asement over 40 acres of prime farmland (1:1 mitigation ratio)."

The adoption of the one-to-one ratio was below the two-to-one ratio urged by Citizens in the trial court.

The March 2008 revised EIR addendum prepared by Pacific Municipal Consultants explained why the city rejected the heightened mitigation ratio: "The EIR acknowledges that agricultural easements are not mitigation in the true sense of the word. They do not lessen the impact to the loss of the farmland . . . . As such, no ratio, no matter how high[,] will achieve a mitigation effect, and no particular ratio can be ultimately justified as the scientifically correct one. For that reason, a statement of overriding considerations is necessary for the loss of farmland. The ratio is therefore a matter of local concern for the council to establish. The standard for California communities is the 1 for 1 ratio and is appropriate in this case. In addition to the City of Lodi, the following agencies in the surrounding area apply the 1:1 mitigation ratio: cities of Stockton and Elk Grove, counties of San Joaquin and Stanislaus, Tri-Valley Conservancy (Livermore/Alameda County)."

On appeal, Citizens contends the city's "rejection of the heightened mitigation ratio [was] not supported by substantial evidence." In support of this argument, Citizens cites law the city was required to consider mitigation measures and reject them only if infeasible or ineffective. The problem with this argument is it is based on law inapplicable to the situation here. The situation here is one where the city has specifically found mitigation measures infeasible and therefore adopted a statement of overriding considerations.

■ An EIR must "identify and focus on" those environmental impacts of the project that it finds to be significant. (CEQA Guidelines, § 15126.2, subd. (a).) The EIR also must describe feasible measures that could minimize significant impacts. (CEQA Guidelines, § 15126.4, subd. (a)(1).) If no mitigation measures are feasible, the EIR must say so. (CEQA Guidelines, § 15091, subd. (a)(3).) If the EIR finds that there are significant impacts for which no mitigation measures are feasible, it must adopt a statement of overriding considerations before approving the project. (Pub. Resources Code, § 21081, subd. (b); CEQA Guidelines, § 15093.) The EIR's findings must be supported by substantial evidence. (Pub. Resources Code, § 21081.5.)

Thus, the question is not whether there was "substantial evidence" to support the rejection of a "heightened mitigation ratio," but rather, whether the finding there were no feasible mitigation measures was supported by substantial evidence. It was.

The 2007 draft revised EIR put forth this substantial evidence: "Development of buildings, paved surfaces, and landscaping necessarily removes the land from agricultural production, and the affected land cannot be recreated or reproduced elsewhere. The land, once converted, loses its character as agricultural land and is removed from the stock of agricultural land. Thus, while the permanent protection of prime farmland elsewhere in the vicinity may reduce the amount of agricultural land converted to urban uses in the County over the long-term, such off-site mitigation would not avoid the significant impact resulting from the permanent loss of prime agricultural lands at the project site."

In the city's findings of fact and statement of overriding considerations, the city explained the following: There were no feasible mitigation measures to avoid the loss of prime agricultural farmland because it was not possible to recreate prime farmland on other lands. The city considered but rejected as infeasible the alternatives of denying the project or substantially reducing its size, but rejected these alternatives because they would not meet the fundamental objective of the project applicant and of the city, which was developing the site for a commercial retail shopping plaza that conformed to the

city's general plan and zoning designations. The city would minimize and substantially lessen the significant effects of the proposed project by requiring the project applicant to acquire an offsite agricultural conservation easement.

This substantial evidence supported the finding there were no feasible mitigation measures.

## V–VII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## VIII

### The Doctrine of Res Judicata Prevents Lodi First from Raising Its Water Supply Issue

Lodi First claims the project has significant, undisclosed water supply impacts and the revised EIR failed to disclose cumulative water supply impacts. The trial court held that res judicata barred Lodi First from raising this claim. Respondents reassert the applicability of res judicata. Lodi First claims the doctrine does not apply and, in any event, we should reach the merits of its claim on public policy grounds.

Res judicata or claim preclusion bars relitigation of a cause of action that previously was adjudicated in another proceeding between the same parties or parties in privity with them. (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896 [123 Cal.Rptr.2d 432, 51 P.3d 297].) Res judicata applies if the decision in the prior proceeding is final and on the merits and the present proceeding is on the same cause of action as the prior proceeding. (*Busick v. Workmen's Comp. Appeals Bd.* (1972) 7 Cal.3d 967, 974 [104 Cal.Rptr. 42, 500 P.2d 1386].) Res judicata bars the litigation not only of issues that were actually litigated but also issues that could have been litigated. (*Id.* at p. 975.) We apply this test below.

## A

### The Decision in the Prior Proceeding Was Final and on the Merits

The writ issued in *Lodi First I* was final and on the merits. In December 2005, the trial court granted Lodi First's petition for writ of mandate, holding

---

*See footnote, *ante*, page 296.

the 2005 EIR was inadequate under CEQA with respect to its cumulative urban decay analysis and potential energy impacts analysis. The city decided not to appeal that ruling. That ruling was final because the time to appeal the trial court's judgment has expired. (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1203 [24 Cal.Rptr.3d 543].) It was a decision on the merits because the judgment decided the merits of Lodi First's challenges under CEQA. (*Federation*, at p. 1203.)

B

*The Present Proceedings Was on the Same Cause of Action
as the Prior Proceeding*

Causes of action are considered the same if based on the same primary right. (*Tensor Group v. City of Glendale* (1993) 14 Cal.App.4th 154, 160 [17 Cal.Rptr.2d 639].) A claim in the present proceeding is based on the same primary right if based on the same conditions and facts in existence when the original action was filed. (*Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 227 [103 Cal.Rptr.3d 124].) Even if petitioner's challenge is not based on the same conditions and facts, those different conditions and facts must be "material." (*Id.* at p. 229.)

Lodi First claims the project has significant, undisclosed water supply impacts because the project is relying on water from an overdrafted basin and the revised EIR failed to disclose cumulative water supply impacts.

The 2004 draft EIR contained a water supply discussion. It stated, among other things, "the project would result in increased demand for domestic water service," but there was a "less-than-significant impact" requiring no mitigation because "existing water resources and infrastructure w[ere] adequate to serve the project."

Lodi First claims the city's 2005 urban water management plan dated March 2006 and "other water related documents" released after the city certified the 2004 EIR showed "changed water supply circumstances." Specifically, the plan estimated a safe yield for the aquifer serving Lodi was 15,000 acre-feet per year, the groundwater production in 2004 was 17,011 acre-feet per year, and the city exceeded the estimated safe yield since 1996. Other city water documents included a report by city staff prepared for a March 2006 city council meeting recommending the council's preliminary approval implementing a surface water treatment program (the "treat and

drink" alternative). That report mentioned the 2005 urban water management plan and stated the safe long-term yield of the aquifer serving Lodi was 15,000 acre-feet per year and "[a]t present, the City is using 17,300 [acre-feet per year] to meet the demands of existing customers, reflecting a current need for additional water supply and/or conservation." According to Lodi First, these "new facts and evidence demonstrate additional water supplies are needed to serve new development like the [p]roject."

The problem is this is not new evidence. The city's 1990 general plan EIR stated, " 'Because overdraft of the aquifer already exists in the [general plan] area (resulting in lowering the water table at a rate of between 0.5 and 1.75 feet per year), it is unlikely that future water demands can be met without increased overdraft and salt water intrusion . . . . [¶] The overdraft of groundwater has caused the infiltration of saltwater from the San Joaquin Delta. . . . Currently, the [c]ity relies on groundwater for municipal supplies. Increases in municipal demand caused by development allowed under the [p]roposed [general plan] would cause confined overdraft." While Lodi First claims the "new" evidence establishes more than the 1990 general plan EIR, i.e., "the [c]ity's sustainable yield from the aquifer is *something less* than currently extracted," the critical fact was that the city's water supply was inadequate to serve new development. And this was known at the time of the 2004 EIR.

Lodi First also claims res judicata does not preclude its water supply challenge because the city's 2009 "findings" regarding the project's water supply impacts differ from its 2005 "findings." Specifically, Lodi First notes the 2004 draft EIR stated that while the "the project would result in increased demand for domestic water service," there was a "less-than-significant impact" requiring no mitigation because "existing water resources and infrastructure w[ere] adequate to serve the project." Lodi First then notes what it claims to be a "diametrically opposed" finding in 2009 that the project developers were paying a $765,050 "fee estimate" for their share of an anticipated water capacity impact fee which the city stated was "to pay for the costs to construct a water treatment plant necessary to provide water to the [p]roject."

Lodi First is wrong in asserting the city's 2004 and 2009 "findings" were different. The city's 2004 finding (which was actually made in 2005 in the resolution certifying the 2004 EIR) and the city's 2009 findings (which was in the findings of fact and statement of overriding considerations) were consistent in that both findings were that the project would have no significant impact on water supply and therefore, no mitigation was necessary.

The 2009 fee, which Lodi First refers to as a "finding," was actually a condition of approval for the project. That condition of approval in 2009 was not materially different than the project's original conditions of approval. Specifically, the conditions of approval in 2005 stated that to "assist the City in providing an adequate water supply, the property owner is required to enter into an agreement with the City that the City of Lodi be appointed as its agent for the exercise of any and all overlying water rights appurtenant to the proposed Lodi Shopping Center, and that the City may charge fees for the delivery of such water in accordance with City rate policies." The 2009 conditions of approval simply attached a dollar figure to the fee the city was charging the property owner for delivery of that water.[14]

Lodi First's water supply claims in this proceeding were based on the same conditions and facts in existence when the original action was filed. As such, res judicata bars us from considering them here.

## C

### *Public Policy Does Not Preclude the Application of Res Judicata*

 Lodi First contends even if the doctrine is technically applicable, res judicata should not be applied to the water supply issue because of "justice and the public interest exception." In support of its argument, Lodi First cites the following passage: " '[W]hen the issue is a question of law rather than of fact, the prior determination is not conclusive either if injustice would result or if the public interest requires that relitigation not be foreclosed.' " (*City of Sacramento v. State of California* (1990) 50 Cal.3d 51, 64 [266 Cal.Rptr. 139, 785 P.2d 522].) This passage does not apply for a simple reason—Lodi First's water supply issue is not one of law. In contrast, in the case cited by Lodi First where res judicata was technically applicable but the court reached the disputed issue anyway, the issue was the interpretation of a statute. (*Ibid.*) For this reason, Lodi First's public policy argument is unpersuasive.

---

[14] The 2009 condition of approval does state the fee was to "pay for the costs to construct a water treatment plant necessary to provide water to the [p]roject." However, a document cited to by Lodi First explained that the water treatment plant will be built to meet the city's and region's future water demands without mentioning the project, meaning it will be built with or without the project. Specifically, the report by city staff prepared for a March 2006 city council meeting recommending implementing a surface water treatment program stated the plant was being built to meet the city's future water demands, share the burden of regionwide water demands, and reduce reliance on groundwater. There was no mention of the project. The cost of the plant is upwards of $29.5 million.

## DISPOSITION

The judgments in *Citizens II* and *Lodi First II* are affirmed. The order discharging the writ in *Lodi First I* is affirmed. Costs on appeal are awarded to the city, Browman Company, and Wal-Mart. (Cal. Rules of Court, rule 8.278(a).)

Raye, P. J., and Hull, J., concurred.

A petition for a rehearing was denied April 18, 2012.