Filed 12/8/21  O'Neal v. Stanislaus County Employees' Retirement Assn. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| MICHAEL R. O'NEAL et al., | F079201 |
| Plaintiffs and Appellants, | (Super. Ct. No. 648469) |
| v. | |
| STANISLAUS COUNTY EMPLOYEES' RETIREMENT ASSOCIATION, | **OPINION** |
| Defendant and Respondent; | |
| COUNTY OF STANISLAUS, | |
| Intervener and Respondent. | |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Robert F. Moody, Judge.  (Retired Judge of the Monterey Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Law Office of Michael A. Conger and Michael A. Conger; Richard H. Benes for Plaintiffs and Appellants.

Reed Smith, Harvey L. Leiderman and Maytak Chin; Damrell, Nelson, Schrimp and Fred A. Silva for Defendant and Respondent.

Hanson Bridgett, Raymond F. Lynch, Adam W. Hofmann, and Matthew J. Peck for Intervener and Respondent.

-ooOoo-

**<u>OVERVIEW</u>**

Michael R. O'Neal (O'Neal), Rhonda Biesemeier (Biesemeier), and Dennis J. Nasrawi (Nasrawi) (collectively, appellants), appeal following a bench trial in which the trial court entered judgment denying their claims. Appellants are members of the retirement system operated by respondent Stanislaus County Employees' Retirement Association (StanCERA) through their retirement board (the board). The intervener in this case, County of Stanislaus (County), is one of several employers required to fund the StanCERA retirement system.

This is the third time this case has come before this court. In the prior two instances, we reversed decisions made by the trial court that dismissed the case prior to trial, finding that appellants had properly stated a claim for relief and that factual issues precluded a grant of summary judgment. Our prior published opinion on this matter, *O'Neal v. Stanislaus County Employees' Retirement Association* (2017) 8 Cal.App.5th 1184 (*O'Neal*) provides a detailed overview of the case, its procedural history, the relevant core legal principles, and the factual allegations underlying the action. The parties here are also intimately familiar with the facts. Accordingly, we generally limit ourselves in this opinion to reciting general facts relevant to the case, including more specific factual detail as we work through the multitude of issues raised by appellants.

Amid the recession and its aftermath that spanned at least 2009 through 2011, both StanCERA and County experienced substantial financial effects. StanCERA through a loss on investments, and County through a loss of tax revenue. At around the same time, StanCERA discovered errors in its prior actuarial calculations that indicated it had failed to identify and collect necessary payments from County in the two years leading up to June 30, 2008. Based on the legal structures governing retirement systems, StanCERA

2.

was required to account for those mistakes and losses and recalculate County's payment obligations accordingly. This recalculation created an inevitable consequence given the financial situation of the time. At a point when County's resources were substantially reduced, StanCERA's legal obligations created a substantial increase in the amount of money County was required to provide to cover StanCERA's unfunded liabilities.

County informed StanCERA that the increased financial burden was not feasible from its standpoint and requested relief. It informed StanCERA that a failure to act could result in layoffs that would affect StanCERA members along with other consequences. It implied that something must be done.

Based on this request, and over the course of three years, StanCERA made five disputed financial transactions that effectively eliminated nonvested benefits for certain members that had been funded for decades with nonvaluation reserves. StanCERA also adjusted both the period over which unfunded liabilities must be repaid and the manner in which those payments were calculated in a way that resulted in substantial periods of negative amortization of those debts.

When reduced to its essence, this case presents a straightforward question: Why did the board authorize those actions? StanCERA argues the board acted to protect its members and the overall health of the system in a time of crisis. Appellants contend the board acted to protect County at the expense of its own members in an effective raid on the pension funds.

The trial court examined the evidence and concluded both that appellants could not prove the board placed County's interest ahead of its members and that the evidence affirmatively supported StanCERA's claim it was acting to protect its members and the retirement system in a time of crisis. The court further found the board acted with proper prudence when making these decisions.

On appeal, appellants raise several issues. Initially, they attack many of the trial court's evidentiary rulings. Appellants argue these rulings left them without critical

3.

evidence while providing StanCERA the opportunity to introduce irrelevant facts that benefited StanCERA's case. Both interspersed with and following these evidentiary arguments are multiple claims that the facts support only one finding – that the board's actions breached their fiduciary duties as a matter of law. Included in these claims is a request that we reassess one of the cases underlying our opinion in *O'Neal* which held that a retirement board may consider potential job losses within the ambit of their members' interests. Finally, appellants present a claim that substantial evidence fails to support the trial court's judgment.

For the following reasons we find no reversible error affecting the trial court's judgment. We therefore affirm. Ultimately, the trial court's position as trier of fact leaves it with the responsibility to determine which analysis of the facts is most credible. Although acknowledging that fair arguments can be made that appellants' perspective can find support in the evidence, we find no fault with the trial court choosing the equally legitimate perspective presented by StanCERA.

## FACTUAL AND PROCEDURAL BACKGROUND

The record at trial in this case consisted of a series of exhibits comprising the various meetings at which StanCERA made the contested decisions, deposition transcripts from witnesses that did not appear, live testimony from various witnesses and experts, and additional exhibits consisting of financial information and other miscellaneous supporting materials. Based on our opinion in *O'Neal*, the focus of the trial was on whether any one of five contested financial actions constituted a breach of the board's fiduciary duties. (*O'Neal*, *supra*, 8 Cal.App.5th at pp. 1217-1222.) These five contested actions were: (1) the 2009 decision to adopt a 30-year level percent of pay amortization schedule for unfunded actuarial accrued liability (UAAL) and subsequent conduct resulting in continuing negative amortization rates; (2) the 2009 decision to transfer $50 million from nonvaluation reserves to valuation funds; (3) the 2009 decision to transfer $10 million from nonvaluation reserves to offset required employer

4.

contributions related to UAAL; (4) the 2010 decision to transfer $21.4 million from nonvaluation reserves to offset required employer contributions related to UAAL; and (5) the 2011 decision to transfer $14.3 million from nonvaluation reserves to offset required employer contributions related to UAAL.  The core facts relevant to this appeal come from the evidence relating to the purposes and motivations underlying these contested actions.  We begin by reviewing that evidence.

## I.        PUBLIC RECORD FOR THE FIVE CONTESTED ACTIONS

StanCERA's retirement fund has, for many decades, generally been a successfully run plan.  As far back as the early 1980's, the fund was able to generate nonvaluation reserve funds that were used to pay supplemental benefits to retirees.  Although there have been past periods of UAAL, the board and County have worked together to reduce or eliminate those amounts.  As one example, County issued pension obligation bonds in the mid-1990's, totaling over $100 million to reduce then-existing UAAL, that required continuing payments through 2013.  In addition, County and the board have worked together to provide other benefits to members, including a pooling arrangement for medical insurance.  As late as 2006, County and the board agreed to a five-year extension of that agreement.

Between 2006 and 2008, however, the fund suffered actuarial investment losses as part of the financial crisis occurring during that time.  These included an investment income loss of more than $120 million in the year ending June 30, 2008.  In addition, StanCERA learned that its prior actuary had utilized incorrect assumptions, causing an underpayment over the preceding two years of nearly $40 million.  Thus, at the time StanCERA began evaluating its plan and determining actuarily required employer contributions in 2009 – action based on numbers dating to 2008 – unfunded liability in the plan had jumped from roughly $40 million to roughly $280 million, corresponding to a drop in funding ration from 96.6 percent to 81.8 percent, relative to 2006.  These changes resulted in an expected increase in County's employer contribution of more than

5.

$22 million from the year before, which included contribution ranges of roughly 16 percent to 29 percent.

County responded to this increase by writing a letter to StanCERA in April 2009. The letter explained County's concern that it was being asked to increase its payments by $22.7 million in a year where it projected a decrease in discretionary revenue of over $17 million. County further explained that it had planned for a smaller increase and, even doing so, had a $34 million deficit in their budget, which they were attempting to balance by implementing a budget reduction strategy and utilizing $8 million in reserve funds over each of the next three years. The proposed increase would increase County's obligations an additional $9.2 million. County explained such a result would result in "deeper cuts to Departments and the services they perform" and that existing "County employees will lose their jobs." County was concerned such actions could also increase retirement rates in the next year.

County further explained that it was seeking ways to further reduce its costs within the confines of its existing negotiated labor agreements. County asked StanCERA to consider postponing supplemental benefits and noted that in the last two years County had "issued layoffs, implemented hiring freezes, and reduced services" to balance its budget. County expressed concern with the expectation that contribution rates would continue to increase over the next few years and noted its past acts in issuing pension obligation bonds and working with StanCERA on issues such as the medical insurance pooling agreement. County thus asked StanCERA to consider the impacts its current funding requirements would have and to ask its actuaries several questions, including about how funding requirements might change if nonvaluation reserves were moved to valuation reserves and what the impact of a 30-year amortization period might be. Draft questions also included one noting that anecdotal evidence suggested members were planning to delay retirement due to the current stock market and economic downturn and one that asked what ways the impact on County could be reduced.

StanCERA then held four public meetings over the next month during which they discussed the issues raised in County's letter and the current funding situation. The first occurred on April 8, 2009, and was focused on the draft actuarial report then pending. Unlike normal meetings where only a handful of people attended, the record shows estimates of between 200 and 250 people attending this meeting. The meeting began with Harvey Leiderman of Reed Smith providing an overview of fiduciary responsibilities held by the board. Leiderman explained the fact that assets are held "exclusively for the benefit of the members and beneficiaries of this retirement system" and a duty of loyalty is owed to those individuals. Leiderman further explained that these individuals included "not only . . . today's retirees, but . . . today's active members of the system . . . who are to become retirees tomorrow," a balance that could cause some friction but required considering both. Leiderman also noted the duty to act prudently. This meant, among other things, "to provide for a sound actuarial-based funding of the system" and to consider all factors then pending. Leiderman specifically noted "that circumstances today are not the circumstances economically when the United States and the State of California, the County of Stanislaus are not the same today as they were last year or the year before" noting that the current situation should be taken into account and expressing that "[t]hings have indeed changed."

In response to a question from the board, Leiderman provided additional advice that the first priority is assuring payment of promised vested benefits. Leiderman expressed that paying benefits was akin to a zero-sum game, thus paying nonvested benefits would necessarily reduce funds available for vested benefits in some way, requiring the board to balance what it was choosing to do to follow its fiduciary responsibilities.

Leiderman's overarching advice was to identify all relevant factors affecting funding decisions, including effects on County and other employers, and work to balance them as best as possible. This was particularly important because some actuarial

7.

assumptions may not come to pass if salary freezes occurred or there were changes in payroll expectations. In line with this, Leiderman advised the board could consider County's difficulty in making payments but should not merely take County's word for it. Leiderman further noted the board could consider the ability to meet future obligations and noted that "the market went into the tank" in October 2008, after the cut-off date for the actuarial report.

Following Leiderman's presentation, the board heard from its actuaries Graham Schmidt and Robert McCrory. Schmidt provided the board with a summary of the actuarial valuations contained in the actuarial report and noted above. This included a detailed discussion of the errors the prior actuaries had made. During this discussion, McCrory explained that the actuarial mistakes were another example of the rule that "[i]f you don't pay now, you pay later with interest," meaning that "every dollar you don't contribute now, is a dollar that you will have to contribute with interest at some point in the future." In further discussions, Schmidt explained that there had been a 16 percent return on investment in 2007, resulting in funds moving to the nonvaluation reserves, but a "significantly lower" return in 2008 leaving an average return of 6.3 percent and an actuarial loss in the system. Schmidt also explained that continuing losses meant the actuarial value of the plan's assets at the time were higher than their market value, meaning higher contributions would be required in the next year.

The actuaries went on to discuss charts showing projected funding over the next 20 years, highlighting the amount needed to ensure there were enough funds to cover currently inactive – meaning essentially retired or no longer employed – members. And they specifically discussed various amortization policies and how those compared to the plan's then-current utilization of a 20-year rolling level-dollar amortization. In this discussion, McCrory explained that certain projections showing a 10 percent loss could result in increases in required contributions up to 30 percent of pay while the fund still decreased to less than a 70 percent funding ratio under the current system. In doing this,

McCrory noted that it was not unreasonable to think there may be a 25 percent or worse loss between June 2008 and June 2009, which would raise employer contributions above 36 percent. McCrory noted that these losses were happening to all plans and were things "you pretty much couldn't control." McCrory then explained the actuaries would be reviewing current funding policies "trying to identify those that can [be] modified, that should be modified to balance the interest of all the stakeholders and still maintain the actuarial solvency of the plan." McCrory hoped all could work together on resolving the current funding issues and finding "the best balance of solutions that we can" because the situation was "not so much a decision as it is a dilemma. Anything that you choose to do will have advantages and a long, long list of disadvantages. So it's something that we just have to do the best we can in very difficult circumstances."

Following the actuaries, County's then-chief executive officer, Rick Robinson, spoke to the board. Generally following the point of County's letter, Robinson stated that keeping the current employer contributions given County's budget issues would result in "employee layoffs, furloughs and unprecedented service level reduction for the residents of Stanislaus County." County's position was that a fund as underfunded as StanCERA should not be keeping nonvaluation reserves for purposes other than funding vested benefits. Robinson noted that nearly 4,000 active employees relied on the system to ensure their future retirement. Robinson requested the board add all nonvaluation reserves into the valuation calculation, consider the possibility of a loss of nearly 30 percent the next year, and continue to work with County to come to a workable solution to the funding issues.

The meeting continued with several additional speakers and comments, including additional comments from McCrory about the difficulties of an excess earnings policy when the long-term goal of a system is to meet an average earning mark and as "one of the things we've learned to our sorrow of the past year is that the market can go down a

lot and quickly." The board then agreed to reconvene on April 24, 2009, to further discuss the issues.

The second meeting, involving the Retiree Benefits Committee, was held on April 14, 2009. At that meeting, O'Neal spoke to raise the possibility of directly offsetting County shortfalls, rather than transferring all nonvaluation funds out, to "keep the [nonvaluation] fund intact so that we can live on to fight another day." O'Neal explained that once the fund was gone "it's gone forever" but that they could try to hold on until things got better in an attempt to protect their supplemental benefits. Leiderman provided similar comments, explaining that there were many options available to deal with the funding issues and that the transfer of nonvaluation funds need not be an all or nothing event. Other comments from the board chairperson and other board members highlighted the difficulty of the current situation, the substantial losses the system was facing and the need to act for the stability of the fund generally.

The third meeting, again involving the full board, occurred on April 24, 2009. At this meeting, the board heard from members of the public and others with concerns or statements about the funding issues, including one comment that supported a direct transfer of nonvaluation assets to offset liabilities and a 30-year amortization period in order to avoid removing all funds. The board then heard again from its actuaries who noted a likely 25 percent loss in 2009, resulting in a "significant immediate increase in County contribution" requirements. The actuaries and the board then discussed several potential scenarios for future losses and how those would affect assets and funding ratios, along with multiple amortization options. In these discussions, the actuaries spoke about the possibility of utilizing long amortization periods and level percent of pay, even noting such choices would bring required contributions as low as possible, lower the funding ratio, and result in periods of negative amortization. The actuaries also discussed the effects of moving nonvaluation funds to valuation funds, explaining each dollar moved reduces employer cost by about 10 cents.

10.

The board also heard from Jeffrey Reiger, a lawyer working with Leiderman. Reiger presented a series of options involving the transfer of nonvaluation funds to valuation funds, explaining they should be considered and used as reserves against deficiencies. These options included general transfers of the funds and more specific offsets of UAAL payments. Reiger told the board that all options were considered to be within the board's discretion. After a series of public comments, Reiger also informed the board that if it were to use nonvaluation funds as an offset, it must do so only to offset UAAL, in other words, as a contingency against deficiencies and not as an offset to normal cost contributions. Reiger then reiterated that additional problems may be coming in future years and the board did not need to engage in an all or nothing course of conduct with respect to transfers.

At the conclusion of the meeting, then-County Chief Executive Officer Robinson addressed the board and reiterated County did not seek a bailout, but only that all funds be counted in the actuarial calculations. As a partial response to Robinson's comment, board member Ford noted that an article in the Modesto Bee, comments at the Board of Supervisor's meetings, and general knowledge, confirmed that County had already laid employees off and that there would likely be additional layoffs in the 2009-2010 fiscal year regardless of the board's actions. Additional board comments noted County was not at fault for the funding issues and that low funding ratios were affecting all funds at the time, even strong ones.

In the course of various comments from the public and board members, and the resulting discussions with the actuaries, the board was informed that it maintained assets well above those needed to pay vested benefits for several years. In addition, one of the commenters proposed something close to the package adopted, a 30-year amortization schedule, a $50 million transfer to valuation reserves, and a $20 million offset.

The final meeting occurred on April 28, 2009. The board received an update that confirmed current investment returns were down 28.8 percent, in line with the 25 percent

11.

loss concern discussed in previous meetings. When the board moved to the actuarial study, the retirement administrator, Tom Watson, recommended adopting the report and noted there had been substantial cost increases for the employers, significant reductions in revenue, a poor economy, and a poor market. Watson noted that even mitigation in the range of $10 to $15 million would result in up to 50 percent increases in employer costs.

After comments from the public, several board members, actuary Schmidt, and counsel Reiger, a motion was made to move all nonvaluation reserves to the valuation funds. This motion was defeated. Following this vote, a second motion was made to move $50 million from nonvaluation reserves to the valuation funds, change the amortization period to a 30-year percentage of pay system, and use an additional $10 million in nonvaluation reserves as an offset for County UAAL obligations. This motion passed, resulting in the first three contested transfers.

In 2010, a similar process occurred. As the planning began, retirement administrator Watson wrote to the board noting the draconian and unprecedented investment losses that had occurred and explaining that County was currently suffering from a revenue problem, having one of the 10 lowest revenues for California counties at the time. In addition, the board received two letters from employers. County again informed the board of its financial situation. Seeing another proposed increase in employer contributions, County explained it projected another shortfall in its budget, this time of $20 million. County again noted it had previously had to conduct layoffs and hiring freezes and was planning its current budget through portions of 2012. This time, County requested a $12 million annual offset to increased contributions through 2014, a transfer of all remaining nonvaluation reserves to valuation funds, and a continuation of the 30-year amortization schedule. The second letter came from the City of Ceres (Ceres), which explained that general fund reserves had fallen almost 20 percent over the last two years and, as a result, Ceres had reduced expenditures accordingly, including by eliminating jobs and freezing salaries. Ceres was concerned that its contribution rate was

12.

more than doubling, to 23.21 percent of pay under the current proposals and asked for both a phase in period as well as offsets and an adjustment of Ceres's amortization period to match County's.

StanCERA again held public meetings on these issues. During these meetings, then-County Chief Executive Officer Robinson informed the board that it had negotiated 5 percent salary reductions with most of its labor groups. Another board member noted County employees were receiving no cost-of-living adjustment and significant reductions. Then-City Manager Brad Kilger, on behalf of Ceres, noted that in addition to the information contained in the letter, Ceres would be asking for a 10 percent compensation reduction from all its staff. This time however, upon a proper motion, the board chose to shorten the current amortization period to 25 years and transfer $21.4 million from nonvaluation reserves to valuation funds as an offset to increasing UAAL payments, with $20 million to County's costs and $1.4 million to Ceres and other districts' costs.

In 2011, the process repeated. County again sent a letter noting a general fund shortfall of $28 million and repeating the efforts it had made at cost reduction. This time County requested an offset of $12.6 million. In addition, the Stanislaus County Superior Court sent a letter stating that a lack of offset would be financially devastating for the court. After a public meeting at which the board reviewed how other retirement plans had been dealing with the financial downturn and it was noted the retirement system now had 1,000 fewer employees, the board readopted a 25-year amortization period for UAAL and, in line with recommendations from retirement administrator Watson, approved another $14.3 million offset transfer from nonvaluation reserves to valuation funds to provide County with the $12.6 million it requested.

## II. TRIAL TESTIMONY

As additional support for their claims, appellants called several witnesses, including appellants O'Neal, Nasrawi, and Biesemeier, former County Chief Executive

Officer Stan Risen, and retirement administrator Tom Watson. Appellants each expressed their recollection of the board's actions, stating they saw little to no meaningful investigation of the claims made by County or no benefit for retired members. Within Nasrawi's testimony was also an acknowledgment of the financial situation of the time. Nasrawi stated he knew of layoffs and furloughs occurring after 2009, County could not reduce salaries unilaterally but could utilize layoffs under their collective bargaining agreements, that there was a major decline in housing prices, and that property taxes were a major source of revenue for County.

Risen testified to the steps County had taken or not taken leading up to and through the 2009 to 2011 period. Risen explained that the main funding for the retirement funds comes out of County's general fund. The general fund also pays many County salaries, which are generally set by collective bargaining agreements. This portion of County's budget is primarily funded through sales and property taxes, which can make up to 90 percent of the funding. Risen noted that County saw the leading edge of the recession around 2007 when there was a roughly $10 million dip in sales taxes. In 2008, that dip turned into "fall off[s]" in both property and sales tax revenues. County eventually became a "foreclosure capital[]" in the nation, which caused a property price reduction that triggered property tax reviews under Proposition 13, further reducing revenue and leaving County with the third lowest revenue from property taxes in the state. Ultimately, County's general fund decreased from roughly $180 million to roughly $140-$145 million between 2007 and 2012.

Risen identified several steps taken by County to manage this budgetary change. In the 2008-2009 fiscal year, County implemented a hiring freeze, curtailed benefits, and required a 3 percent reduction in County costs across all departments. This was followed in the 2009-2010 fiscal year by an additional 5 percent cost reduction to public safety departments and a 12 percent reduction to nonpublic safety departments. In the 2010-2011 fiscal year, another 9 percent reduction in net County costs was required. These

14.

reductions required the elimination of roughly 1,000 positions across the county, including a reduction in the actual workforce of around 380, and additional losses through attrition. In addition, County negotiated and its employee organizations agreed to, a furlough policy in 2009, which included a 5 percent salary cut for all employees in exchange for 13 furlough days, at a savings of roughly $5.5 million a year for the general fund.

Risen conceded that there was no formal quantification of the number of jobs lost in the recession, that County never considered bankruptcy proceedings, and that it did not consider additional pension obligation bonds or borrowing to pay for the increasing retirement contributions. Risen also noted that board member Ford was County's treasurer between 2008 and 2012, the same period of time he was serving on StanCERA's board.

The main testimony supporting appellants' case, though, came from their expert, William Sheffler. Sheffler testified as an expert in the field of public and private pension plans and the actuarial aspects thereof. He detailed the importance of timely payments to pension systems, explaining that funding comes from employer and employee contributions as well as investment returns. Of these, investment earning generally constitute 70 to 80 percent of a plan's funding. Accordingly, late payments into a system reduce investment earnings and cause funding issues.

Sheffler was tasked with reviewing the five contested transactions for actuarial soundness and whether the board acted responsibly when implementing them. In his testimony, Sheffler ultimately agreed there were factual circumstances in which the actions taken by the board could satisfy their fiduciary duties, particularly where short-term actions taken in a crisis ensure long-term stability. He further conceded there was no indication that StanCERA would fail to pay vested benefits at any point in the future. However, Sheffler's opinion on the five actions in this case was that each constituted a

15.

breach of fiduciary duty because the board had failed to confirm that the factual circumstances which could warrant such actions existed at the time they acted.

To support his position, Sheffler pointed primarily to advice provided to the board by its fiduciary counsel and actuaries. In that advice, the board was told that it was acceptable to consider employer conditions, but "don't just take their word for it. Ask questions. If you're told that the County's benefit is X, Y, or Z, get a copy of the budget. Look at it. Ask questions about it. Ask the assessor what's happen [*sic*] to the assessed value in the county. Is this really going to be a substantial disruption in what's going on?" Similarly, as noted by Sheffler, StanCERA's actuaries, Schmidt and McCrory wrote to the board in 2009 that, "[i]f a policy decision results in a reduced current contribution by the employer, there should be a reasonable explanation why this decision will help the plan, not just the employer."

Taking this advice as a critical explanation of what should have happened, but did not, Sheffler opined that he could find no substantial inquiry in the record which showed the board investigating County's claims of financial difficulty and that the board had failed to identify any way in which the actions it took benefited anyone other than County. Sheffler also opined that he could find no indication in the record that County's payroll was dropping to a point of endangering the plan. He further attacked the implementation of a negative amortization schedule by noting that such a change had neither been requested by County nor proposed by StanCERA's actuaries and appeared to benefit only County. Sheffler noted that from 2009 to 2017 the plan had averaged a 10.79 percent return, above its expected rates, yet the current shortfall is still $674 million.

For StanCERA's part, aside from the public record, StanCERA generally relied on its own experts, including StanCERA's actuary, Schmidt, at trial. Schmidt testified both as a percipient witness and as an expert. Schmidt provided a detailed overview of actuarial practices and how they are utilized in his work as StanCERA's actuary.

16.

Schmidt also provided explanations regarding the meaning of plan funding ratios, actuarial soundness, and the effect of employers not paying their contributions. Ultimately, Schmidt opined that the board's actions were actuarially sound and that he would have disclosed any actuarial concerns he had with the board's actions if any had arisen.

In addition to Schmidt, StanCERA called Peter Mixon, an attorney with experience in advising public pension plans, to opine on whether StanCERA's actions satisfied their fiduciary duties. Mixon's qualifications and opinions, which generally concluded that StanCERA did not breach its fiduciary duties of loyalty or prudence when taking the five contested actions, are the subject of appellants' evidentiary arguments and, thus, are recited in greater detail below.

## III.    THE TRIAL COURT'S STATEMENT OF DECISION

On January 23, 2019, the trial court issued its "Tentative Statement of Decision After Trial." (Some capitalization omitted.) In response, appellants filed a "Request for Statement of Decision and Specification of Principal Controverted Issues of Fact and Law" (some capitalization omitted) containing 126 alleged issues of fact and law that it believed the trial court needed to address. StanCERA objected to these requests, arguing the Tentative Statement of Decision adequately addressed the relevant issues and, directly or indirectly, resolved the points made in appellants' request. On February 22, 2019, the trial court issued its "Statement of Decision After Trial" (some capitalization omitted), adopting without meaningful change the Tentative Statement of Decision After Trial.

On March 1, 2019, appellants filed objections to what they deemed the court's proposed statement of decision and, shortly thereafter, informed the court that the California Supreme Court had issued an opinion in *Cal Fire Local 2881 v. California Public Employees' Retirement System* (2019) 6 Cal.5th 965 (*Cal Fire*). On March 8, 2019, the trial court issued an order explaining that its Tentative Statement of Decision was, by definition, its proposed statement and, thus, its Statement of Decision had been

17.

its final order.  Regardless, the court noted it had reviewed appellants' objections and would not modify its Statement of Decision.  The court further found that *Cal Fire* was not controlling in this case.  It then affirmed it would enter judgment against appellants.

The court's statement of decision spans 58 pages.  It deals with some evidentiary objections and provides a general overview of the law and facts.  The statement reflects the court's determination that appellants failed to meet their burden "of proving by a preponderance of the evidence that the Board breached its fiduciary duties owed its members as a result of the five challenged actions."  Upon its review of the evidence, the court found that "when faced with what amounted to a 'five-alarm fire', the Board properly exercised due diligence, considered its options (as presented to it by its actuarial and fiduciary/legal advisors), and acted as cautiously and conservatively as possible to insure the certainty that its members would receive all vested benefits over time."

After taking judicial notice of the existence of the " 'fact or proposition' that the 'Great Recession' was a large financial shock" and a discussion of relevant legal principles, the court identified a series of "Findings of Fact" (boldface omitted) supporting its determination.  The court began by noting its opinion "that there was actually no clear evidence which tended to prove the Board's actions were taken solely or primarily to benefit the County or any third party or to place the County's interests ahead of the plan beneficiaries, and a plethora of evidence to show the Board's actions were taken with the specific intent to benefit members."  The court then provided a laundry list of factual conclusions supporting its determination.

These conclusions included the history of the board and County working together to provide generous benefits for retirees, a history within StanCERA to provide maximum benefits to members, including by members of the board who voted for the contested action at the time, and a lack of evidence of " 'new blood' " on the board that might change this philosophy.  They also included a lack of evidence of any motive to aid County or act in its interest except when doing so would benefit the StanCERA members

18.

and a lack of evidence of threats against the board if it did not act. It included financial conclusions such as the substantial loss of assets and revenue for both County and StanCERA, including a $10 million revenue loss in 2008 and an additional $59 million loss in 2009 for County, a substantial increase in actuarial projections for County contributions due to the identified actuarial errors and fund's losses, a limited ability for County to utilize budget funds to cover these increases, and a history of reasonable steps on County's part, which included hiring freezes, zero bonuses, reduction of funds to departments, mandatory furloughs, elimination of allocated positions and parttime employees, and negotiated salary decreases. With respect to the board's knowledge, the finding included conclusions such as advisement of the funding issues to StanCERA by County's chief executive officer and its retirement administrator, the board's understanding of its own financial issues and its reliance on public analysis by actuarial experts suggesting its planned actions were feasible options "to weather the current storm and achieve long term stability in plan funding," and indications the board was aware of the substantial financial issues then existing based on its public comments and attempts to find solutions. Looking more toward intent, the conclusions included finding of a lack of indication from fiduciary counsel that the board's actions were improper, the fact the board expressed interest in future supplemental payments under stricter conditions and, ultimately, left $20 million in reserve funds, and an overall view that, while there were disputes over how best to act, the record showed no indication of a belief that no action at all should be taken.

The court then analogized the case to *Claypool v. Wilson* (1992) 4 Cal.App.4th 646 (*Claypool*) and *Bandt v. Board of Retirement* (2006) 136 Cal.App.4th 140 (*Bandt*). In doing so, the court stated it found support for its conclusions that no breach of fiduciary duty occurred and made a few additional findings of fact. First, it found the board did not breach a fiduciary duty by increasing the amortization schedule of the plan's unfunded liabilities stating the evidence showed negative amortization was not

19.

actuarially unsound and, on and after April 28, 2009, the board took action to shorten the amortization period significantly resulting in higher employer contributions. The court noted the board did not " 'roll over' the 30-year amortization period for even one year" and "immediately reduced the amortization period from 30 years in the 2008 valuation to 25 years in the 2009 valuation." Second, it found that, although appellants attempted to establish County did not have to lay off active members in the association (employees), the evidence demonstrated that the number of active members actually decreased by 486 between June 30, 2009, and June 30, 2011. Third, it found it to be legitimate that the board concerned itself with the potential job losses of its active membership as well as with protecting the interests of its members who are beneficiaries. Fourth, it found the board, in making its "five challenged decisions," did not place the interests of County over the interests of the members of StanCERA. The board allowed short-term County contribution relief during extreme circumstances "which served the interests of its members by saving jobs of active members and by spreading out a large, unavoidable UAAL over a sufficient number of years to bring stability and actuarial soundness to a troubled system."

The court concluded its review of the facts and its conclusions by noting that it found no breach of fiduciary duty based on "intergenerational equity."[1] Noting that many current retirees had been negatively affected by the board's actions, the court noted that the interests of active employees were equally relevant and that all participants suffered some downside from the actions, even if the overall goal of those actions were to shore up the long-term viability of the plan. In this regard, the court noted again that the

---

[1]  The court quoted *Bandt* defining "intergenerational equity." It is " 'calculating and receiving during each fiscal year contributions which, expressed as percents of active member payroll, will remain approximately level from the present generations of citizens to future generations of citizens.' " (*Bandt*, *supra*, 136 Cal.App.4th at p. 160, italics omitted.)

20.

financial downturn here was significant. It pointed out that the plan was sufficiently funded as " 'late' " as 2007.

The court then briefly reviewed its views of the various experts' testimony provided in the case before expressly finding "that the StanCERA Board as representatives of the members of the retirement association were true to their Constitutional, statutory, and common law fiduciary duties" to appellants, warranting judgment in StanCERA and County's favor.

This timely appeal followed.

## **DISCUSSION**

## I. **THE TRIAL COURT'S EVIDENTIARY RULINGS**

In advance of and during trial, the court made several evidentiary rulings that appellants contend on appeal warrant reversing the court's final judgment. With respect to requested discovery, appellants argue they were improperly precluded from taking depositions of individual board members and the lawyers who provided them with public advice. With respect to trial decisions, appellants contend the trial court admitted and considered improper expert testimony from both Schmidt and Mixon, while excluding proper and relevant testimony from McCrory. Appellants also contend the trial court wrongly admitted evidence of County's financial conditions that was not specifically placed before the board during its decisionmaking process. We consider each argument in turn.[2]

---

[2] Appellants have raised the trial court's failure to take judicial notice of the ballot arguments regarding Proposition 162 as an error and requested this court take judicial notice of those materials. Upon review, we find no prejudice in the trial court's decision not to take express notice of the requested material. Regardless, we will take judicial notice of the materials identified by appellants. Appellants' motion for judicial notice filed April 27, 2020, is thus granted. We further grant in part and deny in part StanCERA's May 21, 2020 motion for judicial notice. This court will only take judicial notice of its opinion *O'Neal v. Stanislaus County Employees' Retirement Association* (Feb. 23, 2017, F070605).

21.

A.      Board Deposition Requests

Appellants argue the trial court wrongly granted a protective order preventing appellants from deposing various members of the board.  Contending the court incorrectly applied the deliberative process privilege to the discovery sought, appellants state evidence of the reasons for a trustee's actions is both material and discoverable in a case alleging a breach of fiduciary duty.  Appellants further insist that the error in this case was prejudicial because it prevented appellants from obtaining direct evidence for the board's actions, evidence appellants consider the best evidence available.

1.  *Standard of Review and Applicable Law*

"We review a trial court's discovery orders for an abuse of discretion.  ' " 'The trial court's determination will be set aside only when it has been demonstrated that there was "no legal justification" for the order granting or denying the discovery in question.' " [Citation.]'  [Citation.]  Moreover, when a plaintiff does not seek writ review of the trial court's discovery rulings and instead appeals from the judgment, he or she must 'show not only that the trial court erred, but also that the error was prejudicial'; i.e., the plaintiff must show that it is reasonably probable the ultimate outcome would have been more favorable to the plaintiff had the trial court not erred in the discovery rulings." (*MacQuiddy v. Mercedes-Benz USA, LLC* (2015) 233 Cal.App.4th 1036, 1045 (*MacQuiddy*).)

" 'Under the deliberative process privilege, senior officials of all three branches of government enjoy a qualified, limited privilege not to disclose or to be examined concerning not only the mental processes by which a given decision was reached, but the substance of conversations, discussions, debates, deliberations and like materials reflecting advice, opinions, and recommendations by which government policy is processed and formulated.' " (*Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296, 305.)  " 'Not every disclosure which hampers the deliberative process implicates the deliberative process privilege.  Only if the public interest in nondisclosure

22.

clearly outweighs the public interest in disclosure does the deliberative process privilege spring into existence. The burden is on the [one claiming the privilege] to establish the conditions for creation of the privilege. The trial court's determination is subject to de novo review by this court, although we defer to any express or implied factual findings of the superior court.' " (*Id.* at p. 306.) Further, the privilege is limited in nature, focusing generally upon decisions "*undergoing direct review by a court*" where the "court's function is to review the decision, not the reasoning underlying it; therefore, inquiry into the mental process of the decision maker is irrelevant and inefficient and thus prohibited." (*RLI Ins. Co. Group v. Superior Court* (1996) 51 Cal.App.4th 415, 437, 438.)

## 2. *Appellants Fail to Demonstrate Prejudice*

Upon review, we conclude that appellants have failed to demonstrate actual prejudice from the trial court's ruling in this instance. There is no dispute that evidence existed and was presented which reflects the full scope of public information before the board. Appellants refer to none of this evidence as indicating additional discovery into the specific mindset of any StanCERA board member was warranted, let alone that enough of the board were influenced by non-public information to indicate that the vote by the board may have been tainted by improper motives. Rather, appellants rely on a bald assertion that the "true" reason for the board's actions could not be discovered because the alleged error in precluding discovery prevented appellants from "obtaining either direct or additional circumstantial evidence of the reasons for the board's disputed actions." Highlighting the speculation underlying appellants' position, they go so far to assert that the error prevented them from knowing "whether StanCERA's board took the disputed actions because its trustees were bribed or threatened."

There is no rule of inherent prejudice arising from a civil order denying discovery. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 579.) Rather, the party seeking reversal has the burden of demonstrating actual prejudice arose resulting in a miscarriage

23.

of justice. (*Ibid*.) The evidence admitted in this case allowed for contrary interpretations regarding why the board took the actions it did. This included evidence regarding the alleged budget crisis suffered by County and the possibility of layoffs arising therefrom. While specific statements from each board member regarding their intent in adopting the contested measures may have been helpful to appellants, it is equally likely that it may have confirmed that no improper intent was present. To choose one interpretation of the potential evidence over the other in this circumstance requires pure speculation. Like *MacQuiddy*, appellants' "prejudice argument on appeal is that the categories of information and documents he sought were relevant, and the discovery requests may have turned up admissible evidence. This is insufficient." (*MacQuiddy*, *supra*, 233 Cal.App.4th at p. 1046.) Appellants chose to proceed to trial on the evidence gathered and, in doing so, were able to clear summary judgment based on that same evidence. To demonstrate a miscarriage of justice, then, appellants must find greater support for their claim than a claim that they were prevented from obtaining relevant evidence which may or may not have shed additional light on their claims.

B.    Attorney Deposition Requests

In an argument like that for the board deposition requests, appellants claim they were improperly prevented from deposing the lawyers who provided publicly disclosed advice to StanCERA during their board meetings. Appellants' arguments with respect to this order break down into two general arenas. In the first, appellants argue the public testimony constituted a general attorney-client privilege waiver of all related advice given. In the second, appellants narrow their claims to argue that, at a minimum, the public testimony meant that appellants should have had the right to depose the witnesses on their public statements and the bases therefore.

Considering the claim that a selective privilege waiver required the trial court grant the deposition request, we note that argument is foreclosed under the law of the case. In the unpublished portion of *O'Neal*, this court concluded that the presentation of

24.

that advice did not constitute a selective waiver of privilege because the public testimony was not privileged in the first instance. Thus, the presence of additional advice given subject to an attorney-client privilege is neither appropriate for discovery based on the existence of public testimony nor evidence of additional evidence that could have affected the case.

Regardless, both arguments also fail under the same logic as appellants' argument that the trial court wrongly precluded depositions of board members, appellants have failed to affirmatively demonstrate prejudice. Appellants' argument for prejudice spans little more than a page and essentially argues they were precluded from obtaining potentially relevant evidence, stating they could not discover "evidence of the true reasons for the StanCERA board's disputed actions" or "whether there was *other* advice provided and whether the board followed the advice given to it by its attorneys." The record contains substantial evidence regarding the advice publicly given and the discussion of that advice in the context of the board's decisionmaking process. As with the prior argument, appellants cannot point to any evidence that the information they were allegedly precluded from discovering would have added anything to their case. Rather, as before, they merely state they were precluded from obtaining relevant evidence and speculate that evidence would have supported their case. Such an unsupported claim is insufficient to meet their affirmative burden to demonstrate prejudice.

C.    Testimony from Graham Schmidt

Appellants next argue that testimony provided by StanCERA's actuary, Graham Schmidt, was improperly admitted. Appellants contend that the contested testimony was expert opinion that had not been properly disclosed in discovery and thus should have been excluded. StanCERA and County contest this claim on various grounds, including that the trial court correctly concluded the testimony was not expert in nature. Ultimately, we agree with the trial court and find no error in the admission of Schmidt's contested testimony.

25.

### 1. *Factual and Procedural History*

In preparation for their case in chief, appellants retained and disclosed the use of an expert, William Sheffler. As part of his role, Sheffler reviewed StanCERA's actions and opined that they violated various constitutional principles because the actions were actuarily unsound. Consistent with this planned use and testimony, appellants properly disclosed Sheffler as an expert witness prior to trial and indicated he would opine on "the actuarial soundness of actions taken by StanCERA." At trial, Sheffler generally testified in a manner consistent with his disclosed opinions, although he additionally came to opine that the language used by StanCERA's actuary to certify the plan's finances implied "that the plan is on an unsound basis" in a way that would not be noticed by "the general public or . . . anyone else reading it . . . that . . . was not knowledg[e]able."

In response to appellants' disclosures and in support of its defense, StanCERA identified their actuary Schmidt as an expert witness. Notably, according to appellants, Schmidt's expert designation did not state he would opine on " 'the actuarial soundness of actions taken by StanCERA' " but, rather, vaguely stated he would testify "regarding the actuarial calculations" he had prepared at counsel's request and would be "sufficiently familiar with the pending action to submit to a meaningful oral deposition concerning the specific testimony, including the opinions and the bases for those opinions that he is expected to give at trial." At his expert deposition, Schmidt responded to some questions about his planned testimony by stating he did not have any opinions that he was prepared to discuss, although that was clarified slightly, that he generally was prepared to answer questions asked of him, and that the only other topics he may discuss at trial were his work with StanCERA as a consulting actuary.

At trial, StanCERA's counsel asked Schmidt about his work as an actuary for StanCERA and his related actuarial certifications. During this testimony, various lines of questioning drew objections from appellants that Schmidt was providing undisclosed expert opinions. The first arose when counsel asked about the meaning of 100 percent

26.

funding, questioning whether such a system could continue paying benefits if that employer disappeared. When counsel then asked if it was correct that an 80 percent funded plan did not mean it was paying out only 80 percent of funded benefits, another objection was made. In response to this objection, counsel argued his questions were not seeking expert testimony but rather the understanding of StanCERA's actuary from a percipient witness standpoint. A discussion followed, with appellants' counsel arguing that Schmidt's testimony was exceeding the bounds of lay witness testimony and StanCERA's counsel arguing that an actuary can properly describe the meaning of statements they made in their duty as an actuary. Ultimately, the trial court concluded the testimony fell "in between the strict rules of expert witness testimony and the rules surrounding lay testimony," overruling the objection because the witness was "part and parcel of the creation of some of the documents in the case." The court then granted appellants a continuing objection to similar testimony.

Despite this, appellants' counsel again specifically raised their expert disclosure objection when StanCERA's counsel asked whether it was "relevant to the actuarial soundness of [the] system to help an employer make it through a difficult financial time." This objection was again overruled, with the court stating, "his position as the actuarial adviser for a party to the case entitles him to render opinions concerning the actuarial soundness of the plan that we're dealing with."

Based on this ruling, Schmidt went on to testify about the types of factors an actuary looks at when certifying results, including potential planning abilities of entities whose budgets are affected by the actuarial calculations. Schmidt was then asked to discuss the meaning of the actuarial certifications he made after providing evaluations for StanCERA. When asked if he could certify a report that required actuarially unsound employer contributions, Schmidt stated he could but would need to disclose that the plan would not be able to fund the benefits as promised. Schmidt confirmed none of his reports had ever made such a disclosure and, when asked if this meant the plans were

27.

actuarially sound, stated his signature meant that if the assumptions made were met, "the contributions designated for the employer and the employees will be able to fund the benefits as promised." To Schmidt, this is what actuarial soundness meant. Accordingly, Schmidt answered affirmatively when asked whether the plan was actuarially sound and confirmed that there were no actuarial rules against implementing negative amortization schedules.

Ultimately, in issuing its final ruling, the trial court relied in part on Schmidt's testimony, writing, it "found persuasive Mr. Schmidt's opinion that the actions of the Board that he certified were actuarially sound were just that, and that if they were not, he would have had to disclose that fact and show them why that particular action would threaten the payment of benefits. His testimony was that he had no actuarial concerns whatsoever about the Board's challenged actions."

## 2. *Relevant Law*

"If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is:

"(a) Rationally based on the perception of the witness; and

"(b) Helpful to a clear understanding of his testimony." (Evid. Code, § 800.)

"The decision whether to permit lay opinion rests in the sound discretion of the trial court." (*People v. Bradley* (2012) 208 Cal.App.4th 64, 83.)

"Matters that go beyond common experience and require particular scientific knowledge may not properly be the subject of lay opinion testimony." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 131.) For such matters, expert opinion may be admitted provided the expert and their opinions are properly disclosed. (See Evid. Code, § 801 [requirements of an expert opinion]; Code Civ. Proc., § 2034.260 [disclosure requirements].) Expert opinions which have not been properly disclosed should generally

be excluded at trial.  (Code Civ. Proc., § 2034.300; *Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 917.)

### 3.  *The Testimony Was Not Expert Opinion*

Although StanCERA provides several arguments that even if the contested testimony is expert opinion it was properly disclosed and admitted, it also argues in line with the trial court's actual holding that the testimony offered was not expert opinion but rather percipient witness testimony regarding the meaning of statements Schmidt made or did not make in his actuarial certifications.  We thus begin with whether Schmidt's testimony constituted expert opinion at all.  We conclude it does not.

Upon review of the relevant questions and answers provided by Schmidt, in context the questioning focuses upon actions Schmidt took or should have taken in his duties as StanCERA's actuary and his understanding of actuarial principles relevant to his work.  This is particularly true of the questions concerning Schmidt's actuarial certification of his work.  The questions and answers here sought to elicit Schmidt's personal understanding, through his work experience, of how he would act if improper funding decisions were made.  Although these questions utilized language that had been adopted by appellants' expert to claim the system was "actuarially unsound," their import was not to elicit an expert opinion on the soundness of the system but rather to factually detail how Schmidt would act were the types of errors alleged by appellants found in the system.  We thus find no error arose when the trial court permitted these questions and answers.

We note one or two questions do hew closer to the side of opinion – whether lay or expert – than those detailing Schmidt's understanding of his work and his expected conduct when conducting his work.  The strongest example arises at the conclusion of the contested evidence where Schmidt is specifically asked whether StanCERA's employer contributions were actuarially sound during the period in which he served, to which Schmidt responded, "Yes."  Although this question and answer summarizes the points

29.

made above, and thus may rightly be categorized as legitimate lay opinion, our conclusion would not change were they categorized as improperly disclosed expert opinion. (See *People v. Bradley*, *supra*, 208 Cal.App.4th at p. 83 [lay witness permitted to use phrase designed to convey accounting principles].) The trial court's statement of decision indicates that it relied not on any unsupported opinion provided by Schmidt but upon acceptance of his properly admitted statements that he would have been required to report any "actuarially unsound" practices had he identified them and that he did not make any such disclosures. Thus, even if appellants could demonstrate improper opinion testimony was introduced, the trial court's reliance on the properly disclosed practices of a percipient witness precludes appellants from demonstrating injury sufficient to reverse. (See *Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, 112 [review of discretionary ruling requires showing of injury which, for improper questioning, is often mitigated by existence of cross-examination].)

D.     Testimony from Peter Mixon

Appellants challenge the testimony provided by StanCERA's expert, Peter Mixon. Appellants contend both that Mixon was not properly qualified as an expert and that his expert testimony cannot constitute substantial evidence that StanCERA did not breach its fiduciary duties. On this latter point, appellants argue Mixon's opinions were both based on false assumptions of the facts and contradicted by the evidence admitted. We do not agree.

1.     *Factual and Procedural History*

During discovery, StanCERA designated Mixon as an expert in public retirement fund fiduciary duties who would opine that StanCERA's actions did not violate its fiduciary duties. Mixon is an attorney who had previously served for 11 years as general counsel to the California Public Employees' Retirement System (CalPERS). In that role, Mixon regularly provided legal advice to the governing board on their fiduciary responsibilities among other matters. Mixon further served on the governance

30.

committee, which focused on best practices for the governing board when making decisions and provided fiduciary training. Finally, Mixon was a member of the National Association of Public Pension Plan Attorneys through which he provided additional training and attended presentations on relevant fiduciary duties. Mixon conceded, however, that he had never personally served as a trustee of a public pension system.

Prior to trial, appellants moved in limine to exclude expert testimony from Mixon. After briefing, the trial court denied appellants' motion and permitted Mixon to testify. In doing so, it specifically noted Mixon would "not be permitted to opine as to the legality of StanCERA's actions" but that he could "render opinions as to whether the Board's actions abused their discretion or constituted a breach of fiduciary duty." At trial, appellants renewed their motion in limine, arguing Mixon's failure to serve as a trustee in a public pension system left him unqualified. This argument was rejected.

At trial, Mixon provided several relevant opinions, which he formed after reviewing the records of public board meetings held by StanCERA between 2009 and 2011, the actuarial reports provided, and the record in the case. The first was that the board's transfer of $50 million in April 2009 was consistent with their fiduciary duties. Mixon opined the board "followed a prudent process" by hiring well-qualified and appropriate experts, including an actuarial firm and outside fiduciary counsel, holding public meetings, and ultimately relying on their expert's advice and opinions. He further opined that the decision satisfied the board's duty of loyalty. On this point, Mixon focused on the nature of the nonvaluation reserves and the fact the money did not fund earned benefits and thus was spent at the discretion of the board. Mixon opined that moving these funds to support earned benefits fulfilled the purposes of the StanCERA trust in part by enhancing the security of the vested benefits, was in the best interests of the members and the beneficiaries, and thus satisfied the duty of loyalty. Mixon acknowledged that the transfer had the collateral benefit of lowering employer contributions but opined that such collateral effects are not violations of the duty of

31.

loyalty. He compared the effect to regularly accepted practices like asset smoothing, where losses are averaged over multiple years to aid with employer planning, and limited partnership investments, where returns may be split between the plan and a general partner.

Mixon next opined that the $10 million, approximately $21 million, and roughly $15 million employee payment offsets made between 2009 and 2011 were also consistent with the board's fiduciary duties. Mixon provided the same basis for his opinion, that the use of nonvaluation funds to support earned, rather than unearned, benefits is entirely consistent with the purpose of the StanCERA trust.

Turning briefly to whether StanCERA could, consistent with their duty of loyalty, consider members' jobs when decisionmaking, Mixon opined such considerations were proper. Mixon noted that he was aware of County's statements that it was having budget issues and would have to resort to layoffs. Mixon pointed out that all fulltime employees are members of the retirement system and, thus, should have their interests considered. Relatedly, Mixon opined that considering County's potential credit worthiness if action is not taken would also be appropriate. If the board's actions resulted in County refusing or being unable to pay its employer contributions, members' interests would be harmed.

Finally, Mixon opined that adopting a 30-year level percent of pay amortization schedule was also consistent with the board's fiduciary duties. For this opinion, Mixon focused primarily on the fact the board retained and followed the advice of an expert actuarial firm in making its decision.

On cross-examination, Mixon acknowledged that none of the reserve funds had been utilized to minimize employee contributions. Mixon further conceded that he could not be sure he saw all the legal advice given to StanCERA but affirmed that he had reviewed all the public advice contained in the record. In later questioning, Mixon affirmed that the board was acting based on a request from County for contribution relief and stated he did not believe the board was required, under its fiduciary duties, to

32.

question or further investigate claims made by County about potential job losses when making decisions.

### 2. *Relevant Law*

"Expert testimony is admissible to prove custom and usage in an industry. [Citations.] But such testimony is subject to foundational challenges. For example, the lack of foundation of an expert's testimony can be as to the expert being qualified, the validity of the principles or techniques upon which the expert relied, or as to the reliability and relevance of the facts upon which the expert relied. [Citation.]" (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1114 (*Kudrow*).)

"Evidence Code section 720, subdivision (a) provides, 'A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert.' '[T]he qualifications of an expert must be related to the particular subject upon which he is giving expert testimony.' " (*Kudrow*, *supra*, 208 Cal.App.4th at p. 1115.)

"The foundation required to establish the expert's qualifications is a showing that the expert has the requisite knowledge of, or was familiar with, or was involved in, a sufficient number of transactions involving the subject matter of the opinion. [Citations.] 'Whether a person qualifies as an expert in a particular case . . . depends upon the facts of the case and the witness's qualifications.' [Citation.] '[T]he determinative issue in each case is whether the witness has sufficient skill or experience in the field so his testimony would be likely to assist the jury in the search for truth.' " (*Kudrow*, *supra*, 208 Cal.App.4th at p. 1115.) Notably, the " 'calling of lawyers as "expert witnesses" to give opinions as to the application of the law to particular facts usurps the duty of the trial court to instruct the jury on the law as applicable to the facts, and results in no more than a modern day "trial by oath" in which the side producing the greater number of lawyers

33.

able to opine in their favor wins.' " (*Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1598-1599.)

### 3. *Mixon was Properly Qualified as an Expert*

Appellants raise two claims regarding why Mixon should not have been qualified as an expert. Both revolve around Mixon's status as a lawyer. First, appellants state that Mixon's testimony interfered with the court's own judicial functions because his testimony arose from the fact he had previously given legal advice to CalPERS. Second, appellants point to the fact that Mixon had not previously served as a trustee for a public pension system as demonstrating he was not sufficiently qualified to testify as an expert on trustee's actions in those systems. We reject both assertions.

The trial court's express ruling that Mixon would not be permitted to provide opinions on legal issues demonstrates it was aware of the risk that permitting an attorney to testify as an expert could raise regarding the court's role in identifying the proper legal principles to apply. Upon review of the record, the court strongly protected this role, specifically rejecting attempts by both parties to have Mixon discuss case law in the field. With respect to the testimony permitted, Mixon's opinions focused upon whether the actions taken by StanCERA's board, as reflected in the record provided, breached their fiduciary duties. The issue of breach is a factual point, not a legal point. If Mixon were thus properly qualified to discuss this factual point, his status as an attorney would not preclude him from testifying.

On this latter point, we find no reason why Mixon would not qualify as an expert on retirement board fiduciary duties and their breach. As the record shows, Mixon had extensive experience in researching, advising, and teaching on the subject. And his overall credentials were more than adequate. Appellants' primary focus is not upon Mixon's overall expertise, but rather on the fact he had not served in the exact role related to his testimony. We are aware of no requirement that an expert actually work in the area of their expertise if their credentials are otherwise sufficient to demonstrate their

34.

expertise. Indeed, the case law shows that sufficient expertise can be gained from education in the course of other work. (*People v. Catlin* (2001) 26 Cal.4th 81, 131-133 [noting qualifications other than a license to practice medicine may qualify a witness to give a medical opinion and affirming expert against claim he was not trained in proper field based on extensive experience and training in contested issue].) Appellants' complaints go to the weight to be given Mixon's opinions, not his qualifications to provide them in the first place.

### 4. *Mixon's Opinions were Properly Considered*

Appellants also raise two issues related to the admissibility of Mixon's testimony. In the first, argued in conjunction with the claim Mixon is not a qualified expert, appellants contend the trial court should not have permitted Mixon to testify the board followed the legal advice they were provided because StanCERA withheld privileged communications between the board and their lawyers from Mixon and appellants. In the second, appellants argue Mixon's testimony was based on false assumptions of fact. Appellants contend the record shows the board did not follow the advice of its fiduciary counsel and actuary because it never requested or received recommendations on how to proceed and failed to ask certain questions of County that its counsel thought worthy of highlighting.

We do not agree. Looking first at the advice of counsel claims, we note that Mixon's testimony was not so broad as to suggest all advice from counsel had been followed. Rather, Mixon indicated he had reviewed the public statements from counsel, conceding he was not privy to confidential information, and opined that the board had met its fiduciary duties by hiring and hearing from competent counsel then adopting that advice. As we concluded above, the trial court correctly rejected a request to produce the privileged documents appellants now claim Mixon should have reviewed. As such, and given the specific nature of Mixon's opinion, we see no basis to exclude his testimony based on the fact certain documents were not produced or reviewed.

35.

We next turn to the claim Mixon's opinions were predicated on false facts and, thus, cannot be viewed as substantial evidence supporting StanCERA in this case. This argument suffers from the same flaw as the prior one, it relies on a characterization of Mixon's testimony that is not supported by his opinions. Appellants rely on deposition evidence stating that the board did not request specific recommendations on whether or not to make the various monetary transfers from its actuary. But there is substantial evidence in the record, as Mixon noted, that the actuaries reviewed various proposals in the context of their effect on the plan if adopted, particularly with respect to amortization changes but also with respect to the effect of transferring nonvaluation reserves to valuation funds. Mixon's opinion the board sought and adopted advice from its actuary thus readily fits with the evidence presented, as Mixon noted in his testimony that the board was not bound to follow any specific proposal provided it reasonably reviewed the advice provided from its experts. Similarly, that the board received suggestions that it should, ideally, fully fund the plan or that it should ask for collateral against future contributions but did not follow them is not an indication that Mixon's opinion is based on flawed facts. Mixon never opined that a breach did not occur because the board followed each and every suggestion made to it. Rather, Mixon opined that the board followed proper procedures by hiring competent experts and that its ultimate decisions utilized the advice given to it by those experts. We see nothing in the purported conflicts between the facts and Mixon's opinions in this case that would warrant a conclusion Mixon did not base his opinions on true facts. Accordingly, we reject appellants' claims to that effect.

E.      Exclusion of Robert McCrory's Testimony

Appellants allege the trial court erroneously excluded portions of Robert McCrory's deposition testimony. McCrory was another of StanCERA's actuaries and had been disclosed as a potential expert. During his work on the case, McCrory calculated the amount of money that the trust corpus had lost based on the actions taken

by StanCERA's board. When appellants attempted to play deposition testimony discussing this calculation, StanCERA objected, claiming the evidence was irrelevant and unnecessary given that the trial court had previously bifurcated the issue of damages. The trial court agreed, explaining that it did not "see the point in going into questions of the degree of money that would have been in the system under this circumstance or that circumstance where it is stipulated that the degree of money would be substantially less." The court further explained that "the overall question is always going to remain as to whether these actions breached or were an abuse of the discretion of a breach of fiduciary duty of the board" and concluded that spending "a lot of time trying to ascertain the exact numbers of how much of a diminution of cash flow into this overall system would have been at this phase of the trial seems to me to be not relevant, not helpful, and not a productive use of the Court's time."

Appellants contend that damages are an essential element of a breach of fiduciary duty claim and, thus, exclusion of damages evidence prejudiced their case. However, it is uncontested that the issue of damages in this case had been bifurcated. While it is correct that the full claim of breach of fiduciary duty requires proof of (1) the existence of a fiduciary relationship, (2) its breach, and (3) damage proximately caused by that breach, these elements are generally independent of each other. (*O'Neal*, *supra*, 8 Cal.App.5th at p. 1215.) The fact that damages arose does not prove the board breached its fiduciary duties nor is the lack of damages proof that no breach occurred. We thus see no error in the trial court's conclusion that issues related to the scope of damages were irrelevant to the current phase of the proceedings. (See *Grappo v. Coventry Financial Corp.* (1991) 235 Cal.App.3d 496, 504 [noting trial court's broad discretion to determine order of proof in the interests of judicial economy under relevant statutory law].)

F.      Evidence of County's Financial Condition

Appellants challenge the trial court's admission of County's documents purporting to show the financial distress County suffered from 2009 through 2011. Appellants

contend the evidence was irrelevant because these documents were not before the board at the time it made its decisions. StanCERA responds that the evidence was properly admitted, at least in part, to contradict appellants' claim that County misrepresented its financial condition to the board.

Evidence Code section 351 states that "[e]xcept as otherwise provided by statute, all relevant evidence is admissible." Evidence Code section 210 defines "relevant evidence" to be, inter alia, "evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." We review a court's decision to admit evidence for an abuse of discretion. (*Donlen v. Ford Motor Co.* (2013) 217 Cal.App.4th 138, 148.)

We find no error in the trial court's ruling. Whether the documents were before the board or not, the financial status of County was certainly an issue of consequence to the determination of the action. The record shows that County raised the issue of financial difficulty and its potential impact on StanCERA members, resulting in StanCERA taking the contested actions. Evidence County was correctly reporting the need to act was probative of the board's purported knowledge of County's circumstances and of the basis for the board's acceptance of County's statement.

## II.    THE TRIAL COURT'S DECISION

Having considered appellants' evidentiary objections, we turn to appellants' concerns regarding the trial court's decision in this case. Appellants raise a series of issues in the context of arguing that substantial evidence does not support the trial court's decision. We first consider those issues before turning to whether the trial court's decision is supported by the evidence. We then briefly consider appellants' claim, raised in reply, that the trial court's statement of decision is sufficiently flawed to require reversal. Finally, we conclude with appellants' contention that the cumulative effect of errors in this case requires reversal.

A.    Appellants' Request to Review *Bandt*

As part of their arguments on appeal, appellants raise a direct attack on *Bandt*, *supra*, 136 Cal.App.4th at page 159 and its statement that a retirement board could consider the effect of its conduct on current members' jobs when making decisions because a member's interest as an employee is related to their interest as a beneficiary. Although this court reviewed *Bandt* extensively in *O'Neal* and ultimately "agree[d] with that analysis," in part because a "trier of fact could view conduct preserving current jobs as good for current retirees who rely on continuing contributions to ensure the viability of their retirement" (*O'Neal*, *supra*, 8 Cal.App.5th at p. 1219), appellants contend not only that *Bandt* was wrongly reasoned, but that it has been overruled by *Cal Fire*, *supra*, 6 Cal.5th 965.  Appellants extend their position to argue that this court's review in *O'Neal* should not be considered the law of the case based on the " 'unjust decision' " and " 'intervening clarifying law' " exceptions to that doctrine.  The crux of appellants' argument is that *Cal Fire* confirmed that public pension employees have no vested right to employment and, thus it would be improper for a retirement board to consider protecting those nonvested rights over existing members' vested rights or existing supplemental benefits.  We do not agree.

*Cal Fire* only touched on the right to employment in an ancillary manner.  It was a contracts clause dispute under the California Constitution that arose because certain employees had been granted a statutory opportunity to purchase up to five years of additional retirement service (ARS) credits before the state modified the statutory scheme to remove that option.  (*Cal Fire*, *supra*, 6 Cal.5th at p. 970.)  Certain employees sued, claiming that the ARS credit was a "vested right protected by the contract clause of the California Constitution." (*Id.* at p. 976.)  Our Supreme Court took the case and concluded the statutory opportunity to purchase ARS credits was not a vested right and therefore could not trigger the protections of the California Constitution's contract clause because there was no intent to form a contract that created an irrevocable right to

purchase these credits. (*Cal Fire*, *supra*, 6 Cal.5th at pp. 980-983.) The high court then contrasted this finding with the implied contractual rights afforded to the deferred compensation system contained in California's pension laws. (*Id.* at pp. 983-986.) The court then engaged in a final review of reasons why, even if the purchase opportunity was an offer of a unilateral contract, its revocation was both proper and not constitutionally protected. (*Id.* at pp. 986-994.) It was in that context that the court briefly discussed the concept of employment rights with respect to pension system members. (*Id.* at pp. 990-992.) In that discussion the court explained that the opportunity to purchase ARS credit was not constitutionally protected "solely because it involved the pension system." (*Cal Fire*, *supra*, 6 Cal.5th at p. 990, italics omitted.) The court reviewed two cases dealing with employment changes that affect future pension rights: *Miller v. State of California* (1977) 18 Cal.3d 808, which considered whether one could be forced to retire prior to reaching the age of full pension benefits; and *Creighton v. Regents of University of California* (1997) 58 Cal.App.4th 237, which considered whether a program offering additional benefits for early retirement could be modified to reduce the benefits offered for those that had not yet accepted. (*Cal Fire*, *supra*, 6 Cal.5th at pp. 990-992.) These cases stood for the principle that "a term and condition of public employment that is otherwise not entitled to protection under the contract clause does not become entitled to such protection merely because it affects the amount of an employee's pension benefit." (*Id.* at p. 992.)

From this principle, appellants extrapolate that because one's term of employment is not a vested right, it cannot be deemed a member "interest" that can be considered when a retirement board makes decisions under their fiduciary duties, and certainly not when the board reduces existing benefits or employer contributions. We, however, do not see such a sweeping claim within the Supreme Court's analysis, nor would such a conclusion logically follow.

A vested right, such as pension benefits being paid to retired members, is one protected by California's Constitution. (*Cal Fire*, *supra*, 6 Cal.5th at p. 972, fn. 3.) It generally cannot be modified or changed based on these protections. Nothing in *Cal Fire*, our own review of the law, or logic suggests that a vested right is the only type of right or interest that can be considered under the fiduciary duties owed by a retirement board to its members. Indeed, such a concept would run contrary to at least part of appellants' case, as the supplemental benefits provided until the nonvaluation funds were fully exhausted in this case are neither argued to be nor properly considered as vested rights under the California Constitution. As we noted in *O'Neal* those benefits are statutorily defined as discretionary. (*O'Neal*, *supra*, 8 Cal.App.5th at p. 1201.)

Moreover, as we noted when discussing trust law in *O'Neal*, the duty to administer the trust solely in the interest of the beneficiaries is often seen as breached when a trustee acts to benefit a third party or advance an objective other than the purposes of the trust. (*O'Neal*, *supra*, 8 Cal.App.5th at p. 1209.) Contrary to appellants' focus on considering only vested rights – such as deferred compensation payments to retired members – such a scope would more naturally imply that a trustee has a fiduciary duty to fully consider the purpose of the trust and seek to take actions across all available avenues that may ultimately support that purpose. We concluded in *O'Neal*, and reaffirm here, that these considerations may include consideration of current members' potential job losses, their effect on members' future interest in a pension, and their effect on the overall ability of the plan to continue paying benefits to those already retired provided the interests of the trust are not subordinated to any other interests. (*Id.* at pp. 1218-1219.) Nothing in *Cal Fire* requires us to reconsider that position.

B.      No Facts Show Breach as a Matter of Law

Throughout their briefing, appellants make several assertions that functionally allege they have proven a breach of fiduciary duties as a matter of law. In the first, appellants contend a breach of the duty of loyalty occurred because StanCERA used trust

assets to offset actuarially required employer contributions. In the second, relying partially on their view on the viability of *Bandt* discussed above, appellants contend a breach of fiduciary duty occurred because StanCERA's claim that it granted relief to save jobs was pretextual. In the third, appellants argue the adoption of a negative amortization rate benefits only employers and thus constitutes a fiduciary breach. And in the fourth, appellants argue that ceasing the nonvested but statutorily authorized benefits and adopting a policy that precluded such benefits in the future, to minimize employer contributions, constituted a breach of fiduciary duty.

Our analysis of *Cal Fire*'s lack of relation to *Bandt* and our continued adherence to *O'Neal* readily resolve appellants' claims with respect to the first and third assertions. In *O'Neal* this court considered and rejected appellants' claims that they were entitled to summary judgment based on the actions noted in the first and third assertions.

The first assertion falls within this court's prior discussion as to why appellants were not entitled to summary judgment on their improper transfer claims, as it relied on a claim that transferring nonvaluation reserves to valuation reserves was improper under the circumstances of the case. At the time, this court noted there were two types of transfers involved, one that converted nonvaluation funds to valuation funds and thereby proportionally reduced the employers' required contributions, and one that replaced required employer contributions with portions of the nonvaluation funds. Focusing on this second type of transfer, appellants assert they have proven a breach of fiduciary duty because the board failed to require the full actuarially required payments to be made by employers. However, as we explained in *O'Neal*, neither type of transfer necessarily broke the law. (*O'Neal*, *supra*, 8 Cal.App.5th at p. 1211.) Rather, such transfers are permissible if the board acts for the benefit of the trust's interests and not the employer's interests. (*Id.* at p. 1213.) We further noted that under prevailing law, breach of fiduciary duty was an issue of fact. Appellants' assertion relies upon the premise that any transfer which directly reduces required employer contributions violates the fiduciary

42.

duty of loyalty. But this premise is exactly what we rejected when we concluded that facts supported the inference that such transfers, while reducing employer contributions in the short term, could also benefit the trust in both the short and long term by preserving members' jobs and the stability of the system as a whole. (*Id.* at pp. 1217-1219.)

The same is true for appellants' third assertion, which relies on the premise that a negative amortization rate can only benefit the employer and, thus, must constitute a breach of fiduciary duty if utilized. As we noted in *O'Neal*, there is generally no legal bar to the adoption of negative amortization rates, save for the fiduciary duties binding the decision makers. (*O'Neal*, *supra*, 8 Cal.App.5th at pp. 1215, 1220.) As this court noted in the summary judgment context, perpetual underfunding was a substantial fact in appellants' favor, but a fact finder could look at the potential for job protection and find that no breach occurred. (*Id.* at p. 1221.) Appellants' claim that adopting a negative amortization schedule could benefit only the employer is not legally sustainable considering our prior determination that a fact finder could conclude that it could benefit employees, at least through job retention results. Moreover, other benefits, such as reduced volatility and increased preservation of employer contributions in a time of financial crisis could also demonstrate both short- and long-term benefits to the trust.

Appellants' second and fourth assertions also fail. As noted above, the second assertion maintains that any claim of job preservation is pretextual in this case. Appellants base this on an alleged lack of diligent investigation and lack of facts, like a contract specifically protecting jobs or the insurance arrangement in force at the time. The fourth assertion contends a specific course of conduct on the part of StanCERA – eliminating current nonvested benefits and adopting a policy that effectively precludes reintroducing them in the future – is a breach of fiduciary duty. Appellants argue that "StanCERA managed the system to put the provision of statutorily authorized benefits out of reach" and thereby "gave preference to the County's interest in reducing its required employer contributions rather than providing benefits to its members." Both

assertions, however, require this court to accept appellants' framing of the underlying logic of StanCERA's actions. For the second assertion, this court would have to accept that a lack of relevant research into the number of jobs saved necessarily means StanCERA was not acting in its members' interests. This court would have to conclude that, because appellants can frame the resulting actions as poor financial decisions, no aspect of the financial downturn, no claims of substantial budget shortfalls potentially affecting jobs in the county, and no concern about the long-term fundamentals of the trust based on the downturn, motivated StanCERA to act. Similarly, the fourth assertion requires this court to ignore any possibility that StanCERA was protecting the vested benefits of the entire plan through job protection and efforts to smooth the effect of the financial downturn through elimination of nonvested benefits and modifications that ensured future excess earnings were used to further support vested benefits rather than be diverted to pay nonvested benefits. Here, appellants seemingly argue that any "benefit" loss, whether vested or discretionary, is a legal violation; a point we rejected in *O'Neal*. (*O'Neal*, *supra*, 8 Cal.App.5th at p. 1213.)

We see no basis to reject the possibility that additional inferences can be made when reviewing the evidence cited by appellants. This type of factual dispute formed the basis of *O'Neal*'s determination that neither side was entitled to summary judgment. The issue of fiduciary breach is not one that turns purely upon whether job losses were calculated properly, or contracts were entered to protect interests, or funds used for payments to one type of member are diverted to protect other members. Rather, as we noted in *O'Neal*, the inquiry asks whether the board placed the interests of County above the interests of its members. (*O'Neal*, *supra*, 8 Cal.App.5th at p. 1219.) This highly fact-sensitive inquiry is not one that can be eliminated by pointing to flawed results or less than ideal planning. Rather, it requires a wholistic analysis of the current situation, the actions taken, and the interests at stake. Nor is it one that permits a party to seek a second summary judgment or directed verdict analysis without moving for one below.

44.

Indeed, such analyses, even if proper, generally require there be no substantial evidence supporting the defense to succeed. (See *Design Built Systems v. Sorokine* (2019) 32 Cal.App.5th 676, 686 [directed verdict for plaintiff only proper where claim is supported and no substantial support is given to the defense alleged].) Although appellants spend extended time on their claims that they have definitively proven breach, they acknowledge there are some substantial evidence concerns to resolve, writing at the conclusion of their fourth assertion, "we will show in the next section, there was no substantial evidence presented at trial that any of StanCERA's challenged actions benefitted any members, including active employees, or that its actions saved any jobs." We thus consider that claim.

        C.      Substantial Evidence Supports the Judgment

Appellants claim there is no substantial evidence to support an inference that StanCERA acted with the intent to benefit its members and, the argument goes, the inferences drawn by the trial court are so irrational that they must be rejected as a matter of law. We do not agree.

        1.    *Relevant Law*

"We review the trial court's factfinding for substantial evidence. This traditional standard of review is highly deferential. It has three pillars. First, we accept all evidence supporting the trial court's order. Second, we completely disregard contrary evidence. Third, we draw all reasonable inferences to affirm the trial court. These three pillars support the lintel: We do not reweigh the evidence." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581.) "Where, as here, it is the plaintiff asserting on appeal that a defense verdict is not supported by the evidence, it is the plaintiff's burden to show on appeal that there is no substantial evidence to support that defense verdict, and not merely that substantial evidence would have supported a verdict in her favor." (*Flores v. Liu* (2021) 60 Cal.App.5th 278, 297, italics omitted.)

## 2. *Discussion*

As detailed extensively above, the record contains substantial evidence that County and StanCERA were suffering from a significant financial downturn between 2009 and 2011. In dealing with this downturn, County wrote to StanCERA to highlight problems in its budget and how those problems may affect StanCERA and its members. StanCERA took that information and engaged its experts, both actuarial and legal, to determine what course of action it could take in response to those concerns. StanCERA was provided with options for reducing County's required contributions in the short term, a result that would stabilize the system by reducing the massive employer contribution increases and thereby reduce the risk of job losses. It held public meetings and decided upon the contested actions after hearing from its experts, its members, and the public.

At trial, StanCERA brought forth an expert witness who testified StanCERA's board met their duty of prudence by utilizing and following the advice of qualified experts and who testified StanCERA's board was both aware of and met their duty of loyalty by considering the potential to save members' employment while making actuarially sound decisions on how to ensure those members' employers were still contributing to the system. StanCERA also presented evidence demonstrating County's statements of financial difficulty were objectively true, requiring substantial cost-saving efforts on County's part and concessions from employee groups in bargained contracts. It further showed that the downturn and its effect on County was a matter of public knowledge.

Appellants argue that any inference the board acted in its members' interests is impossible to support under the record made in this case. They allege there was no confirmation on the exact number of jobs saved and that there was no evidence job reductions would hurt the trust. They contend the financial records show County eliminated mostly unfilled positions when they did conduct layoffs. They note that the failure to collect the most funds possible at the time appears to have resulted in a

46.

substantial loss of assets as the market appreciated after the downturn. They wonder why no collateral was required or why no contracts to ensure jobs were not eliminated were signed.

None of these points, however, demonstrates the trial court could not look at the record evidence as a whole and draw an inference that the board was working to preserve potential job losses or otherwise respond to the current financial crisis' overall effect on the retirement fund and not working to solve County's budget concerns. Rather, these points generally contend either that the board may have made an error in assessing the situation before it, or that it made what ultimately resulted in less than optimal financial decisions. But, as we noted above when discussing *O'Neal* and appellants' related assertions, such decisions were within the board's authority provided it acted in line with its fiduciary responsibilities. A decision made under the proper fiduciary responsibilities does not morph into an improper action merely because, in hindsight, it was not the best decision available.

Ultimately, the inference drawn by the trial court is not unreasonable given the facts. Faced with a substantial financial downturn affecting both the trust's assets and the financial condition of employers paying into the trust, StanCERA's board was approached by those employers and informed that there were significant financial issues which could affect members' jobs if no relief on increases in required funding were found. StanCERA's board investigated actions it could take to provide short-term relief to employers and implemented steps to gradually move nonvaluation funds from prior excess earning into the valuation funds, thereby eliminating certain long-standing nonvested benefits, while also extending the period in which the ballooning UAAL would be paid back. Notably, its chosen course of action did not mirror the requests made by County, which initially asked for an immediate transfer of all nonvaluation reserves. Instead, it showed a considered decisionmaking process that attempted to

47.

preserve nonvaluation reserves while working to ease the effects of the financial downturn and actuarial errors that were driving employer contribution requirements.

From these actions, competing inferences can be drawn as to whether StanCERA's board acted to benefit County at the expense of members receiving additional benefits or to benefit those members facing potential job loss at the expense of retired members receiving additional benefits. " ' "When an inference is supported by the evidence and is not opposed to human experience and reason it cannot be disturbed by an appellate court." ' " (*People v. Berti* (1960) 178 Cal.App.2d 872, 876.) Here, the trial court could choose from competing inferences derived from the evidence presented – neither of which were precluded by law – and find the notion that StanCERA's board acted within the bounds of its fiduciary duties to protect current members was the more likely. As substantial evidence supports this conclusion, we find no error.

We likewise find substantial evidence supports the trial court's conclusion that the board's acts did not violate its fiduciary duty of prudence. Here, appellants' claims generally assert that the board failed to sufficiently verify County's assertions of need, failed to specifically identify the number of jobs saved, and failed to take steps to ensure future repayment of funds through loan agreements, collateral, or the like. Again, these arguments focus more on the weight to give the evidence showing the board knew of and considered County's position. The record is replete with evidence that the board was aware of both the ongoing financial crisis and its effect on both the real estate and the investment markets. The board's actuaries regularly reported on ongoing losses, the state of the market, and how those major events were affecting employer contribution numbers. And StanCERA's expert specifically opined that the board met its fiduciary duties under the facts then present.

Even if this was all the evidence available, it would generally show knowledge, awareness, and a reasonable explanation for not seeking a detailed and specific breakdown of County's losses. The need to act to stabilize the overall system was

48.

patently obvious. However, there was also evidence that board members had direct knowledge of County's condition through their dual positions and through evidence confirming that County had been taking substantial steps to reduce costs. In this specific factual scenario – where a generationally relevant recession is occurring – it is not unreasonable for the trial court to conclude the board met its general duties of prudence in seeking to reduce employer contributions while making direct transfers of nonvaluation funds in the hope of preserving those benefits if the financial situation changed more quickly than expected.

### D. The Trial Court's Statement of Decision

In their reply brief, appellants add a factual recitation and argument that suggests the trial court's statement of decision was defective because it failed to adhere to California Rules of Court, rule 3.1590, was demonstrably incomplete, and did not specifically address the "126 issues identified by the appellants" as principal or controverted issues. Appellants state the "defective statement of decision requires reversal." We do not agree.

Issues not raised in the opening brief are deemed forfeited. (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 518, 554-555.) Further, we see no obvious error in the trial court's actions. Although the trial court considered its "Tentative Statement of Decision After Trial" (some capitalization omitted) to constitute a "proposed statement of decision" as authorized under California Rules of Court, rule 3.1590(c), the record shows it also recognized appellants' attempts to file objections as if the court had issued a tentative ruling and proposed statement of decision separately, ultimately reviewing appellants' objections and determining no further changes were necessary. This is a sufficient procedure. (See *Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 983 ["Even where proper procedure . . . has been followed punctiliously, '[t]he trial court is not required to respond point by point to the issues posed in a request for statement of decision. The court's statement of decision is

49.

sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case.' "].)  We can thus readily reject appellants' assertion that the trial court "flung down and danced upon" the relevant rules while appellants "strictly followed the procedure" to obtain a ruling.

    E.    Cumulative Error

Finally, appellants argue that the cumulative effect of all the errors identified in their briefing warrants reversal, even if no single error alone does.  Upon review of the multitude of issues raised, this court has found no error warranting reversal and no demonstration of prejudice in any assumed errors.  Upon review, nothing in appellants' arguments convinces this court that the cumulative results of a series of erroneous rulings resulted in a miscarriage of justice.  (See *Dam v. Lake Aliso Riding School* (1936) 6 Cal.2d 395, 399 [rejecting claim the cumulative effect of minor errors deprived appellant of a fair trial].)

## DISPOSITION

The judgment is affirmed.  Costs are awarded to Stanislaus County Employees' Retirement Association and County of Stanislaus.


                                                                DETJEN, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


MEEHAN, J.

50.